**NATIONAL LABOR RELATIONS BOARD et al., Petitioners,**

v.

**DAVID BUTTRICK COMPANY, Respondent.**

**No. 6636.**

United States Court of Appeals First Circuit.

Heard April 5 and 6, 1966.

Decided May 26, 1966.

Warren M. Davison, Washington, D. C., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Nancy M. Sherman and Linda R. Sher, Washington, D. C., were on brief, for petitioner.

Mark G. Kaplan, Boston, Mass., with whom Samuel E. Angoff and Angoff, Goldman, Manning & Pyle, Boston, Mass., were on brief, for Milk Wagon Drivers and Creamery Workers Union, Local No. 380, intervening petitioner.

John J. Delaney, Jr., Boston, Mass., with whom Murray S. Freeman, Gordon P. Ramsey, Duane R. Batista and Nutter, McClennen & Fish, Boston, Mass., were on brief, for respondent.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

## OPINION OF THE COURT.

COFFIN, Circuit Judge.

This petition of the National Relations Board seeks enforcement of a Board order

that respondent company shall henceforth engage in collective bargaining in good faith with the exclusive representative of its employees, Milk Wagon Drivers and Creamery Workers Union, Local No. 380, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.[1] Respondent's position in this unfair labor practice proceeding and in an earlier representation proceeding has been that Local 380 is subject to a disqualifying conflict of interest by reason of its alleged subservience to International and the existence of a substantial loan by a pension fund, serving International's members in another geographical area, to Whiting Milk Company, one of respondent's competitors.[2]

The conflict is asserted to lie in pressures that could be brought to bear on Local 380, through efforts of the Fund and International to protect the loan, to take action adverse to or refrain from taking action favorable to respondent and its employees. The Board and its subordinate officers have consistently ruled that there has been insufficient showing of such a connection between Local 380 and the Fund or such participation by the Local in the loan negotiations as to disqualify it from serving as the bargaining agent for respondent's employees.

### Factual Background

Respondent is a dairy products processor and distributor, with its principal place of business in Arlington, Massachusetts. Until September 1964, respondent had approximately thirty drivers servicing twenty-three retail milk delivery routes in some eighteen communities in the Greater Boston area. Eight routes were in Arlington where it was a major distributor. Competition in the entire area served involved several other companies[3] and several hundred milk route drivers.

Local 380 has since 1910 represented milk company employees in the Boston area, and has about 1500 members who are employed by five or six milk companies and several other enterprises. Of these, 600 are employed by Whiting, which serves a much wider area than Greater Boston, and includes neighboring states. Local 380 is an affiliate of International, and subject to its constitution.[4] Since 1961 it has had its own by-laws, which deal with membership requirements, dues, meeting rules, duties and election of officers and barn stewards, and methods of approving compensation of officers, expenditures, and collective bargaining agreements.

[1]. Intervenor in this proceeding and hereafter referred to as "Local 380". The International union will be referred to as "International".

[2]. The fund, hereafter called "the Fund", is the Central States, Southeast & Southwest Areas Pension Fund. This is one of several large pension funds, to which employers and employer associations contribute for the benefit of their employees who are members of International and affiliated union organizations. The Fund is administered by 16 trustees, 8 chosen by various employer groups, and 8 by the four subscribing Area Conferences of International, and their local unions. (These are the Central States Conference of Teamsters, the Central States Drivers Council, the Southern Conference of Teamsters, and the Southern States Drivers Council.) All trustees serve at the pleasure of their appointing authority. In the event of deadlock, provision is made for an agreed upon or court appointed "neutral party". As of January 31, 1963 the Fund's assets were $213,389,484.68.

[3]. The larger of these being Hood's, Whiting, United Farmers, and Woodland, with a number of smaller dealers and independents.

[4]. An extensive resume of International's constitution, before 1961, is contained in International Brotherhood of Teamsters et al. v. United States, 4 Cir., 1960, 275 F.2d 610, 612–614, cert. denied, 1960, 362 U.S. 975, 80 S.Ct. 1060, 4 L.Ed.2d 1011. Significant changes were enacted at International's 1961 convention. General Teamsters, Local 249, 1962, 139 N.L.R.B. 605, contains a further summary of key provisions. Pertinent sections will be discussed later in the opinion.

After corporate reorganization in a federal district court, Whiting came under new management, in or around 1960. Financing was secured through short term bank loans. In 1962, Whiting was exploring sources of longer term financing. The chairman of the board of Whiting became interested in discussing the possibilities of a loan from the Fund and approached a business agent of Local 380 for an introduction to the General President of International. A meeting took place betweeen the two men in July 1962 and a meeting of the Fund's trustees and Whiting's chairman occurred in September 1962, followed by another meeting of the two men in the early spring of 1963. Local 380 played no part in any negotiations. Finally, in the spring of 1963, a loan in the total amount of $4 million was forthcoming, being secured by mortgages of real and personal property, including good will, a pledge of all stock, open end resignations of principal officers and directors, and the right to operate the debtor's business in case of default of any obligation "without restrictions or limitations of any kind". A year later, in July 1964, application was made for an additional loan of $700,000, for expansion into the distribution of refrigerated foods. This was granted in January 1965.

In September 1964, 29 of respondent's retail driver employees went on strike, which strike is still continuing, no re-placements having been hired. On October 7, 1964, the Board's Regional Director ordered an election, which was held on October 29, 1964, resulting in the ultimate certification of Local 380 as the collective bargaining agent for respondent's employees.

■ A formal request to bargain was declined by respondent because of Local 380's alleged disqualification, and the unfair labor practice proceeding followed. In this second procedural stage, respondent proffered the following additional evidence: (1) the actual granting of the additional $700,000 loan; (2) acquiescence by Local 380 in Whiting's initiating discussions with employees about a possible reduction of the work week and elimination of some jobs, and some changes by Whiting in this direction without union protest; and (3) Whiting's decision in 1965, for the first time, to engage in individual bargaining rather than to continue its participation in multi-employer bargaining. The Trial Examiner concluded that respondent's affirmative defense, Local 380's disqualification, had not been sufficiently established to rebut the *prima facie* case of refusal to bargain. The Board affirmed and subsequently denied respondent's motion to reopen the record to receive allegedly new evidence of control by International's General President over both the Fund and bargaining activities of local unions.[5]

---

5. This evidence is in the form of transcripts of Fund meetings and other records which are referred to and drawn upon in a recently published book, James, "Hoffa and the Teamsters—A Study in Union Power", 1965. The General Counsel's opposition to the motion was based on the fact that (1) the underlying records used in the book were not newly discovered, since they were as available to respondent as to the authors; (2) the documents refer to a period of time antedating the Whiting loans; and (3) they do not bear on "the sole issue in this case, i. e., whether Local 380 participated in the negotiations for the aforesaid loan or has any other connection with that transaction."

While, as will be obvious, we feel that "the sole issue" is quite a different one, we do not find reversible error in the Board's denial of the motion as made. Our reading of the book does not add to our understanding of the basic powers, duties, and temptations, which, wholly apart from a past course of conduct, in our view create the conflict of interest problem. Moreover, the motion raised the specter of masses of documentation much of which would be remote in time and irrelevant to the issue. We add, however, that in reconsidering this matter the Board would do well to ascertain the magnitude of the problem described in the sections entitled "Truckers, Trustees, and Las Vegas Resorts", and "The Union's Conflict of Interest", James, op. cit. supra at 271–273, 292–294.

*The Board's Conclusions*

Because we disagree with the approach taken by the Regional Director, Trial Examiner, and the Board, it is essential that the basis of their conclusions be understood. The first decision—in the representation proceeding—was made for the Board by its Regional Director. The issue occasioning this opinion was disposed of in a footnote, as follows:

"2. The Employer contended that, although the Petitioner herein is a labor organization within the meaning of the Act, it is disqualified from participating in the instant proceeding, in view of the fact that Central States, Southeast and Southwest Areas' Pension Fund, a joint labor-management administered fund, had recently loaned certain sums of money to a competitor of the Employer herein. The record in the instant case indicates that Petitioner is not affiliated with said Fund nor did it participate in the negotiations concerning said loan. Accordingly, it is determined that the Petitioner is a labor organization that may participate in the instant proceeding before this Board. Auburn Rubber Company, Inc., 140 N.L.R.B. 919, fn. 3."

We do not take issue with the findings of non-affiliation and non-participation in loan negotiations, nor with the citation to Auburn Rubber Company, Inc., supra, which contains a similar footnote conclusion that another Teamsters local was not "affiliated" with the Funds.[6] Our difficulty is that we do not think the issue of disqualification on the asserted ground of conflicts of interest can be so easily disposed of. The footnoted

findings are correct answers to the wrong questions.

Similarly, when the Board affirmed the Trial Examiner's findings and conclusions in the unfair labor practice hearing, it took substantially the same position on the conflicts of interest issue. The Trial Examiner considered that the basic arguments had already been rejected by the Board as not being supported by the evidence then before it. He concluded that the proffered new evidence of the additional loan, the talk and acts of Whiting relating to eliminating some jobs and shifting to unilateral bargaining did not add enough to overcome the General Counsel's *prima facie* case. The Board, in affirming, said in a footnote:

"* * * like the Trial Examiner, we find that the entire record, as supplemented by these additional facts, contains insufficient evidence of any definite or substantial connection between the Union and the loans by the Fund to Whiting which allegedly give rise to such a conflict of interest as would disqualify the Union from representing Respondent's employees."

Again, we accept the factual statement that there was insufficient evidence of a "definite or substantial connection" between the union and the loans to Whiting, if by this is meant either formal affiliation between Local 380 and the Fund or involvement by the local in the loan negotiations. But, again, this does not dispose of the issue, for it is the interrelationship of powers and temptations created by the Fund's loans to a competitor of respondent which gives rise to the problem, without regard to the circumstances leading to the existence of the loans. The principles attaching to

6. The Auburn case illuminates the potential conflict of interest between union investment and union representation. Here the Fund had bought municipal bonds issued by the city of Deming, New Mexico, to build a plant and attract an Indiana rubber company. The Teamsters sought to become the bargaining agent in lieu of the United Rubber Workers, AFL–CIO, which had represented the company's employees. The letter asserted that the reason lay in assuring a bargaining policy which would not jeopardize the Fund's investment. This claim was deemed to have been asserted too late, i. e., after the representation election. The Regional Director, however, went on to say that there appeared to be no conflict. We are not impressed by the extent of analysis given the problem. See 46 Note, Minn. L. Rev. 573, at 582 n. 30 for a critical comment.

the concept of conflicts of interest in the fiduciary field generally, and also in the field of collective bargaining, look to the prevention and forestalling of conditions which are likely to divide loyalties. Were proof of union "betrayal" required to trigger the application of sanctions, this constructive operation of the law would be largely nullified. We therefore take issue, not with the interpretation of the testimony, nor, of course, with the facts as revealed by the documentary evidence, but rather with the test or standard applied and the application of the undisputed facts to such standard.

While we have often considered ourselves restrained by the teaching of Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, we consider that a fair and sensitive resolution of the basic issue in this case involves the kind of "judgment as to the proper balance to be struck between conflicting interests" where we would not be expected or required to feel bound by administrative conclusions. N. L. R. B. v. Brown et al., 1965, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839.

### Precedents and Principles

While the Board may have been correct in saying of the specific circumstances in Bausch & Lomb Optical Company, 1954, 108 N.L.R.B. 1555, 1562, that the case was "unique", we suspect that as union pension funds continue to grow, particularly with multi-employer contributors, the question of possible conflict between investment protection and worker representation motives is likely to arise with increasing frequency.[7]

We recognize the presence of a number of conflicting objectives which must somehow be kept in balance. There is the right of employees under Section 9(a) of the Labor Management Relations Act (29 U.S.C. 159(a)) to have bargaining representatives of their own choosing. But there is the correlative duty of complete loyalty of such representatives to their constituents, Ford Motor Co. v. Huffman et al., 1953, 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048. On such a loyalty depends in large measure the "reasoned discussion in a background of balanced bargaining relations upon which good faith bargaining must rest". Phelps Dodge Copper Products Corp., 1952, 101 N.L.R.B. 360, 368. On the other hand, there is the obvious right of pension funds to put their funds to good use and not to be unduly circumscribed in their investment opportunities.

At the same time we are mindful of the increasing concern over the eroding effects of direct and even attenuated conflicts of interest, particularly on the part of public officials.[8] In the labor field, similar concern has found its way into legislation, i. e., the Welfare and Pension Plans Disclosure Act of 1958, 29 U.S.C. Sec. 301 et seq., and the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. Sec. 401 et seq. Moreover, bargaining units have been said to have a quasi-legislative function, binding individuals whether consenting or not. See "Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959", 58 Mich.L.Rev. 819 n. 4 (1960), citing Steele v. Louisville & N. R. Co. et al., 1944, 323 U.S. 192, 202, 65 S.Ct. 226, 89 L.Ed. 173. But we must also accept the cautionary advice that "Courts should

7. Not cited in any brief submitted to us was the provocative Note, Union Investments in Business: A Source of Union Conflicts of Interest, 46 Minn.L.Rev. 573 (1962), which deals with the problems of conflict of interest in an era when mounting union reserves and pension funds present widespread opportunities for capital investment.

8. The most concrete example of this concern is the recent comprehensive revision of laws relating to conflicts of interests affecting federal officials. Public Law 87–849, 76 Stat. 1119 (1962), 18 U.S.C. §§ 201–218 (1963). This was in part stimulated by a report "Conflict of Interest and Federal Service 3 (1960)" by the Special Committee on the Federal Conflict of Interest Laws, of the Association of the Bar of the City of New York. See Petrowitz, "Conflict of Interest in Federal Procurement", 29 Law and Contemporary Problems 196 (1964).

take care, in borrowing fiduciary principles from other areas of the law, to avoid interfering with such union activities". Note, 37 N.Y.U.L.Rev. 486, 504 (1962). This is particularly pertinent in a field where Congress has not seen fit to attempt specific legislation.

While there is widespread interest in union democracy, as evidenced by the "Bill of Rights" in the Labor Management Reporting and Disclosure Act, supra, Subchapter II, Sec. 411–415, there is good reason for the great national unions to retain considerable central authority to be able to root out subversion and corruption (See Cox, supra, 58 Mich. L.Rev. at 847) and to remain effective in large scale collective bargaining.[9]

The pertinent cases in this field are few. Perhaps the leading case is *Bausch & Lomb Optical Company*, supra. In this case a local union sought to be recognized as the company's bargaining agent, despite its ownership of a competing concern in the same city. There was no evidence that the union had taken any action to benefit its own company. The Trial Examiner, in ruling for the union, had observed that any abuses could be cured by invoking remedies available under laws prohibitive of acts in restraint of trade. The Board, however, reversed the ruling, pointing out the necessity for a bargaining agent to have "single-minded purpose" and "complete loyalty", saying, 108 N.L.R.B. at 1559:

> "While we agree with the Trial Examiner that no evidence of specific abuse by the Union in the bargaining relationship has been presented, we cannot ignore or disregard the innate danger involved were we to order this Respondent to bargain with a union which is also its business competitor."

The Board referred to the mutuality of concern which sometimes leads to a wage compromise between union and management in the interest of business survival and said, "this retarding influence upon inordinate demands may well be eliminated * * *. Indeed, the success of one [company] could well mean the failure of the other." 108 N.L.R.B. at 1560. It went on to say that it was not fair to put upon the company the burden of trying to disentangle employee from investment motivation, for the company "would be effectively deprived of its right to refuse even to discuss excessive demands designed to force it out of business." 108 N.L.R.B. at 1561. It observed also that the union, representing 7 of 11 wholesale optical firms and the respondent, had considerable control over the labor market.

It concluded by saying:

> "We do not believe it is incumbent upon the Board to hold, in a situation such as involved here, which possesses latent dangers, that merely because the hazards which can be anticipated have not yet been realized, the Respondent-employer is nonetheless under a statutory duty to bargain. We do not mean to imply that given the opportunity the Union would inevitably take advantage of its position in the manner before indicated. It is enough for us that it could and that the temptation is too great." 108 N.L.R.B. at 1562.

To this must be added Chicago Typographical Union No. 16 et al, 1940, 86 N.L.R.B. 1041. Here the Board recognized almost twenty years ago that "the essential indicia of complete local autonomy" are "freedom in the Local to disregard the 'advice' of the International and to conclude negotiations independently."[10] The Board went on to point

---

9. A 1959 study, for the Fund for the Republic, by Leo Bromwich, entitled "Union Constitutions", observes, p. 18: " * * * the uniformly vast powers granted to the chief executive in the American labor movement lead to the reflection that such crystallization of power is called forth by the union's very existence—the natural response, perhaps, of a sprawling organization to the compelling pressures of industrial life."

10. Other Board cases bearing on this issue concern unions unsuccessfully seeking to be bargaining representatives of affiliated unions. In each case the Board prohibited the relationship because of the difficulty in maintaining a single-

out the specific obligations of the local union to submit contract proposals and negotiated contracts to the International for approval, or risk the withholding of strike benefit funds. Although this procedure was not always followed, the Board said, "All we need decide and do decide here is what *powers* the membership contract vests in the organization." 86 N.L. R.B. at 1047 n. 15.

 *Bausch & Lomb* was admittedly a clear case of immediate, direct competition. This is a case of contingent competition.[11] But we distill the following points from this and other cases: (1) it is the innate danger to be guarded against; (2) the existence of this danger does not require proof of abuse of trust, so long as there is sufficient power and temptation to commit such abuse;[12] (3) such a danger, if proximate enough, without evidence of present abuse, can poison the collective bargaining process by subjecting every issue to the questioning of ulterior motives; (4) where such proximate danger exists, it is not exorcised by the mere existence of other legal remedies such as those created by anti-trust legislation;[13] and (5) the keystone freedom required on the part of a local union seeking to become an exclusive collective bargaining agent is the freedom to conclude such bargaining negotiations free of the suspicion that it is motivated by any purpose other than its loyalty to the employees it represents.

In seeking to measure the proximateness of the hazard, we see little utility in asking the general question whether or not the local union is "autonomous". Few locals would have complete autonomy. We can conceive of a local with a large area of autonomy which may nevertheless be required to subordinate or share its authority with its international as to a key function of the bargaining process. It is possible, on the other hand, to conceive of a local which is subordinate in many respects to its parent international union and yet free of any meaningful restriction in its power to set an independent course in its collective bargaining activities. The cases, therefore, which hold that service on a local does not constitute service on an international, e. g., Morgan Drive Away, Inc. v. International Brotherhood of Teamsters et al., 7 Cir., 1959, 268 F.2d 871, cert. denied, 361 U.S. 896, 80 S.Ct. 199, 4 L.Ed.2d 152 (but cf. International Brotherhood of Teamsters et al. v. United States, 4 Cir., 1960, 275 F.2d 610, 614 n. 4, cert. denied, 362 U.S. 975, 80 S.Ct. 1060, 4 L.Ed.2d 1011), or that an international is not responsible for wrongful acts of its locals, e. g., International Brotherhood of Electrical Workers, Local 5 (Franklin Electric Construction Co.), 1958, 121 N.L. R.B. 143, do not necessarily establish the criteria for resolving a conflicts of interest case. What is required is a selective scrutiny of those key powers which a local bargaining agent must be able to exercise with undivided loyalty if it is to engender confidence at the bargaining table.

Coming to the facts of this case, and focussing on what we feel to be pertinent,

---

minded purpose. General Teamsters, Local 249, 1962, 139 N.L.R.B. 605; Seafarers International Union, 1962, 138 N.L.R.B. 1142; Oregon Teamsters Security Plan Office, 1957, 119 N.L.R.B. 207.

11. At the opposite end of the spectrum from Bausch & Lomb are such cases as those where the union investment was in a cooperative store restricted to members and posed no threat to a store with 2300 employees as in Lord & Taylor, 1965, 150 N.L.R.B. 81, and where union members as individuals took on dual roles when they participated in stock pur-

chase plans, as in Richfield Oil Corp. v. N. L. R. B., 1956, 97 U.S.App.D.C. 383, 231 F.2d 717, 58 A.L.R.2d 833, cert. denied, 351 U.S. 909, 76 S.Ct. 695, 100 L. Ed. 1444.

12. Cf. United States v. Mississippi Valley Generating Co., 1960, 364 U.S. 520, 549, 550 n. 14, 81 S.Ct. 294, 5 L.Ed.2d 268.

13. "The anti-trust laws * * * seem to provide protection only to competing employers; they provide no remedy to the employees who are represented by a union which bargains in bad faith because of conflicting interests." Note, 46 Minn.L. Rev. at 598.

Local 380 is subject to the following exercise of authority by International: (1) to arbitrate a controversy if the General President submits the matter to the General Executive Board and the Board feels that the local should arbitrate (International Constitution, Art. VI, Sec. 3); (2) to submit its management to a trustee appointed by the General President, if the latter believes that the local union is acting to "jeopardize the interests of the International Union, or its subordinate bodies" or if he feels such action is necessary to assure the performance of "duties of a bargaining representative" (Art. VI, Sec. 5(a)); (3) to desist from strike if the General President disapproves (Art. XII, Sec. 1(c)); and (4) to submit proposed collective bargaining contracts to the Joint Council and Area Conference and, if such contract provides for a lower standard of working conditions and wages than those prevailing in the area, to await the approval of the General Executive Board of International (Art. XII, Sec. 11(a) and (d)).

Area Conferences, which have the power to approve proposed collective bargaining agreements and also to name the union trustees on the Fund's Board are "at all times subject to the unqualified supervision, direction and control of the General President * * *." (Art. XVI, Sec. 1).

Translating these powers into practical terms, if Local 380 were willing to accept less than the average wages in order to assist respondent to reenter the retail milk delivery market, its ability to so agree is conditioned on acceptance by the Area Conference, which is wholly under the "unqualified supervision, direction, and control of the General President", and the General Executive Board.

But the General President has a fiduciary responsibility to the Fund to see Whiting, a competitor, do as well as possible. On the other hand, if Local 380 wished to ask for substantially higher than average area wages, and were willing to strike for them, the General President faces the possible chain effect of wage escalation on Whiting and might well feel conscience-bound to cause the Area Conference to veto such strike and/or advise the General Executive Board to order arbitration. If Local 380 were zealously to pursue policies which began to hurt Whiting, the General President might even come to the conclusion that the interests of the International (i. e., nearly $5 million of the Fund's money) were in jeopardy, and order a trusteeship. Alternatively, he or the General Executive Board might feel called upon to bring pressures short of these ultimate sanctions.[14]

These possibilities, the extent to which they constitute "innate dangers", their effect on the bargaining process, the feasibility of devising reasonable proscriptions and safeguards—these we think ought to have been the concern of the Board, not whether the local union was "affiliated" with the Fund or had participated in the negotiations leading to the Fund's loan.

Were we to affirm the Board's petition in this case, we would in effect be giving carte blanche to unthinking debt financing by unions in enterprises with which they had bargaining relationships. Some of these chickens would come home to roost in cases of default and operation of the debtor by the union or its fund. But the more difficult problem would be coping with the problems of collective bargaining while lender and borrower were bending every effort to avoid default.[15]

14. See, for example, the discussion in Note, 46 Minn.L.Rev. at 583-586.

15. We note that Canon V of the AFL-CIO Code of Ethical Practices 39 (1958) states: "Neither the AFL-CIO nor any national or international union affiliated with the AFL-CIO should invest in or make loans to any business enterprise with which it bargains collectively." (We also note that there has apparently been no attempt to enforce this provision. Note, 46 Minn.L.Rev. 573, 589). In so noting we do not mean to imply that what has been undertaken voluntarily by one labor organization should by court or administrative fiat be imposed involuntarily on another, particularly where we

But were we simply to remand this case to the Board with instructions to dismiss the underlying representation petition, as respondent urges, we would be setting the stage for a wholesale reshuffling of collective bargaining relationships in the milk industry in the Boston area and perhaps beyond, without giving the Board or the International opportunity to try to come to terms[16] with a problem which was not foreseen when a loan was made in undoubtedly good faith to an enterprise in need.

While we have not hesitated to differ with the Board on what we believe to be an issue of judgment involving basic policy where the underlying facts are undisputed and largely documentary, we recognize that, given basic guidelines, the expertise of the Board is necessary to arrive at a workable solution.[17] One thing is sure. What might have been a unique case twelve years ago will be a commonplace of tomorrow if suitable guidelines and safeguards are not devised.

We therefore remand this matter to the Board for reconsideration in the light of what we have said, in order that it may assess the potential, not merely the actuality, of conflict of interest and frame an order which, hopefully, will balance the legitimate interests of the Fund, respondent, International, Local 380, and respondent's employees.

---

are concerned with a union-management administered pension fund rather than an international union *per se*. Our purpose rather is to underscore the need for discriminating analysis in weighing hazards and devising fair and feasible means for dealing with them.

16. For example, we note that Article XXV, Sec. 2 of International's Constitution states:

"If any provision of this Constitution shall be declared invalid or inoperative, by any competent authority of the executive, judicial or administrative branch of the federal or state government, the General Executive Board shall have the authority to suspend the operation of such provision during the period of its invalidity and to substitute in its place and stead a provision which will meet the objections to its validity and which will be in accord with the intent and purpose of the invalid provisions * * *."

As for the Board's powers, "It likewise has discretion to place appropriate limitations on the choice of bargaining representatives should it find that public or statutory policies so dictate." N.L. R.B. v. Jones & Laughlin Steel Corp., 1947, 331 U.S. 416, 422, 67 S.Ct. 1274, 1278, 91 L.Ed. 1575.

17. The language of Judge Washington in American Broadcasting Co. v. Federal Communications Commission, 1951, 89 U.S.App.D.C. 298, 191 F.2d 492, 501, may not be inappropriate here: "There would appear to be many possibilities for action in this case. The Commission has never made a determination based upon a thorough study of those possibilities. We think it is incumbent upon the Commission so to do."