NATIONAL LABOR RELATIONS BOARD *v.* JONES
& LAUGHLIN STEEL CORP.

No. 418.   Argued March 7, 1947.—Decided May 19, 1947.

*Ruth Weyand* argued the cause for petitioner. With her on the brief were *Acting Solicitor General Washington, Gerhard P. Van Arkel, Morris P. Glushien* and *Mozart G. Ratner.*

*John C. Bane, Jr.* argued the cause for respondent. With him on the brief were *H. Parker Sharp* and *Paul J. Winschel.*

*Arnold F. Bunge* filed a brief for the Packard Motor Car Company, as *amicus curiae,* in support of respondent.

Mr. Justice Murphy delivered the opinion of the Court.

Like *Labor Board* v. *Atkins & Co., ante,* p. 398, this case involves the rights of militarized plant guards under the National Labor Relations Act, 29 U. S. C. § 151 *et seq.* But certain problems are raised here which are not present in the *Atkins* case.

Respondent owns and operates several large steel manufacturing works and was engaged in the production of war materials during the recent war. At respondent's Otis Works at Cleveland, Ohio, about 4,700 individuals are employed. Production and maintenance employees constitute the great bulk of these workers. But there is also included in the total a group of guards and watchmen, numbering about sixty men normally.

A union affiliated with the United Steelworkers of America, C. I. O., has been the exclusive bargaining agent for the production and maintenance employees. Under a contract made with respondent late in 1942, this union disclaimed any representation of "Foremen or Assistant Foremen in charge of any classes of labor, watchmen, salaried employees and nurses." On March 15, 1943, this union filed a petition for investigation and certification of representatives pursuant to § 9 (c) of the Act, in which it sought to be certified as the collective bargaining representative of the guard force. A hearing was then held. Respondent claimed that a unit composed of these guards was inappropriate because they "perform certain assigned work that is strictly representative of management." Respondent also claimed that any allegation by the union that a unit including watchmen is appropriate was "a direct contravention" of the 1942 contract. And it was further alleged that any unionization of watchmen or guards was particularly inappropriate during a time of war, that their duties "do not differ greatly from the duties

performed by members of a city, county or state police force" and that these guards had been sworn in as auxiliary military police of the United States Army.

The testimony at the hearing showed that there were currently 72 plant protection employees. Of these, 58 were patrolmen whose sole duty was to protect and guard the Otis Works; there were 2 firemen to maintain the fire equipment; 2 dump laborers were assigned to work at a refuse dump while watching that section of the plant; and there were 8 lieutenants and 2 fire captains supervising the others. All of them were carried on respondent's payroll and were under respondent's control as to pay, benefits and conditions of employment. And, as respondent had alleged, they had been sworn in as civilian auxiliaries to the military police of the United States Army, in the same manner and under the same conditions as detailed in the *Atkins* case.

On May 3, 1943, the Board issued its decision and direction of election. 49 N. L. R. B. 390. It found that "all patrolmen, watchmen, and firemen, including dump laborers employed by the Company at its Otis Works, but excluding lieutenants, captains, and supervisors" constituted an appropriate unit and that an election should be held by the employees in this unit to determine if they desired to be represented by the Steelworkers union. It rejected all of respondent's contentions, pointing out among other things that the union, while representing production and maintenance employees, intended to bargain for the plant guards and watchmen as a separate unit.

The election resulted in the selection of the Steelworkers union as the bargaining representative of the unit in question. The union was certified as the exclusive representative of the unit, respondent refused to bargain with the union and the Board issued its complaint based upon that

refusal. On December 2, 1943, the Board reaffirmed the appropriateness of the unit and found that respondent had committed unfair labor practices in refusing to bargain. The usual order was entered. 53 N. L. R. B. 1046.

The Sixth Circuit Court of Appeals denied the Board's petition for a decree enforcing its order. 146 F. 2d 718. While upholding the Board's determination that the militarized guard forces were employees within the meaning of the National Labor Relations Act, the court felt that the unit selected for bargaining purposes was inappropriate and reflected a disregard by the Board of the national welfare. In the eyes of that court, the Board's fatal error was its authorizing the militarized guards to join the same union which represented the production and maintenance employees because "when they were inducted into the Unions and became subject to their orders, rules and decisions, the plant protection employees assumed obligations to the Unions and their fellow workers, which might well in given circumstances bring them in conflict with their obligation to their employers, and with their paramount duty as militarized police of the United States Government." 146 F. 2d at 722.

The Board filed a petition in this Court for a writ of certiorari. As in the *Atkins* case, the Board pointed out that the plant protection employees had been demilitarized at a date (May 29, 1944) subsequent to the refusals to bargain, but urged that this fact did not make the case moot. We granted the writ of certiorari at the same time as we granted the writ in the *Atkins* case, vacated the judgment below and remanded the cause to the Circuit Court of Appeals "for further consideration of the alleged changed circumstances with respect to the demilitarization of the employees involved, and the effect thereof on the Board's orders." 325 U. S. 838.

The Board and the respondent then entered into a stipulation relative to the dates and circumstances of the demilitarization of the guards. From this stipulation it appeared that the qualifications, strength, functions and duties of the guards continued to be the same after demilitarization as before. Also included in the stipulation were facts showing that both before and after the period of militarization, August 5, 1942, to May 29, 1944, the guards were commissioned, sworn and bonded as private policemen of the City of Cleveland and exercised "the legal powers of peace officers in their work as plant guards." It was further stipulated that because of "the magnitude and other characteristics of the Otis Works, its police protection by the ordinary police of the City of Cleveland is not practical or feasible; and, as a result, for a great many years, the police protection of the Works and the enforcement of law, peace and good order therein has been delegated wholly to the plant guard force. For similar reasons, the work of preventing and extinguishing fires has been in large part the responsibility of the guard force, rather than that of the municipal fire department."

The Board filed a motion in the Circuit Court of Appeals for a decree enforcing its order. That court denied the motion and held that the facts concerning both the demilitarization and the deputization were to be considered as though they had been presented at the hearing before the Board; on that basis, the court reaffirmed its belief that the guards were employees within the meaning of the Act, but concluded that in view of the "drastic police powers" exercised by the guards, it was "improper for the Board to permit their organization by the same union which represents the production employees." 154 F. 2d 932, 934.

Our decision in the *Atkins* case makes clear that the demilitarization of the guards did not render this case

moot. The order was a continuing command which may be effectuated in the future. But unless the order was valid when it was issued, there is no basis whatever for it and no court can decree its enforcement in the future. Hence its validity must be judged as of the time when it was issued, a time when the guards were still militarized. This is not to say, however, that events subsequent to demilitarization are irrelevant in deciding whether the order should be enforced. All that we hold is that demilitarization in and of itself is not enough to render the order or the case moot.

The *Atkins* decision likewise disposes of any issues relating to the effect of militarization upon the status of the guards as employees within the meaning of § 2 (3) of the National Labor Relations Act. To that extent, the Board's order here was plainly valid. Unanswered by the *Atkins* decision, however, is the question whether the militarization of the plant guards precluded the Board from grouping the guards in a separate unit and permitting them to choose as their bargaining representative a union which also represented production and maintenance employees. To that issue, which is the primary one raised by this case, we now turn.

The Board, of course, has wide discretion in performing its statutory function under § 9 (b) of deciding "the unit appropriate for the purposes of collective bargaining . . . ." *Pittsburgh Plate Glass Co.* v. *Labor Board,* 313 U. S. 146. It likewise has discretion to place appropriate limitations on the choice of bargaining representatives should it find that public or statutory policies so dictate. Its determinations in these respects are binding upon reviewing courts if grounded in reasonableness. *May Stores Co.* v. *Labor Board,* 326 U. S. 376, 380. A proper determination as to any of these matters, of course, necessarily implies that the Board has given due consider-

ation to all the relevant factors and that it has correlated the policies of the Act with whatever public or private interests may allegedly or actually be in conflict.

Thus, in determining the proper unit for militarized guards and in deciding whether they should be permitted to choose the same union that represents production and maintenance employees, the Board must be guided not alone by the wishes of the guards or the union or by what is appropriate in the case of non-militarized guards. It must also give due consideration to the military duties and obligations of the guards and their possible relationships to a union representing other employees; it must consider what limitations, if any, on the normal freedom to choose whatever representative the guards may desire are necessitated by the war effort.

It is clear that the Board has given these matters due consideration. It has not acted in this case in disregard of the national welfare. Sanctioning the creation of a separate unit of respondent's guards and permitting them to select a union of their own choosing, a union which happened to be the representative of the production and maintenance employees, are indicative of a considered, mature judgment on the Board's part. The problem has been raised in many cases before the Board and its conclusion is in accord with that reached by the War Department.

In *Chrysler Corp.*, 44 N. L. R. B. 881, *Dravo Corp.*, 52 N. L. R. B. 322, and *Armour and Co.*, 63 N. L. R. B. 1200, the Board has spelled out the various considerations that have led it to adopt the policy applied in this case. Those cases reveal the Board's belief that freedom to choose a bargaining agent includes the right to select an agent which represents other employees in a different bargaining unit. This principle may safely be applied to militarized guards, in the Board's opinion, since the collective bargaining

process is flexible enough to allow for the increased responsibilities placed upon the militarized guards. And the Board has concluded that the remedy for inefficiency or wilful disregard or neglect of duty on the part of such guards lies in the power of the employer to discipline or discharge them and in the power of the military authorities to take whatever steps may be necessary to protect the public interest. Moreover, the Board has discovered no serious question as to any conflict between loyalties to the Army and to the union, the Board finding no basis to assume that membership in a union tends to undermine the patriotism of militarized guards or that loyalty to the United States would be secondary in their minds to loyalty to the union. But one restriction is placed upon the statutory freedom of the militarized guards. The Board insists that they be placed in separate bargaining units so that they may be better able to function within the military sphere and so that the military authorities may be able to exercise greater control over them.

This policy of the Board coincides with that expressed in the regulations of the War Department. As we pointed out in the *Atkins* case, *ante*, p. 398, the military authorities have given full sanction to collective bargaining on the part of militarized guards, provided only that such action does not interfere with their military obligations. Paragraph 6h (2) of Circular No. 15, issued on March 17, 1943, by Headquarters, Army Service Forces, acknowledges with approval the Board's policy of permitting militarized guards to be represented in collective bargaining with the management by a bargaining unit other than that composed of the production and maintenance workers, even though both bargaining units may be affiliated with the same labor organization. A clarifying memorandum of the War Department, dated July 10, 1943,

reiterates the War Department attitude still further: "In the event that plant guards enrolled as Auxiliary Military Police desire to be represented in collective bargaining with the management, they should be represented by a bargaining unit other than that representing the production and maintenance workers. However, in such event, both bargaining units may be affiliated with the same trade-union local, provided they are, in fact, separate bargaining units."

We are unable to say that the policy formulated by the Board is without reason. When the employer retains unfettered power to fix the wages, hours or other working conditions of militarized guards, the guards stand in the same relation to the employer regarding those matters as do production and maintenance employees. In disputes with the employer over those matters, they suffer from the same inequality of bargaining power as suffered by other unorganized employees; the appropriateness and need of collective bargaining on their part through freely chosen representatives are equally as great. But to prevent them from choosing a union which also represents production and maintenance employees is to make the collective bargaining rights of the guards distinctly second-class. Such a union may be the only one willing and able to deal with the employer. Its experience and acquaintance with the employer and the plant may make it specially qualified to bargain for the guards. The guards might thus be deprived of effective bargaining rights if they are denied the right to choose such a union. Freedom to choose, in this statutory setting, must mean complete freedom to choose any qualified representative unless limited by a valid contrary policy adopted by the Board.

After deliberation, the Board has concluded that this freedom can safely be recognized to the fullest extent as

to militarized guards, provided only that they be placed in separate bargaining units. We cannot say that this conclusion is one so lacking in an appreciation of the military necessities of the situation that we should voice our disapproval and substitute our own views of public policy. It is significant that the Board, in weighing the military requirements against the normal policies of the Act, has arrived at a result which coincides with that reached by the War Department. The latter agency has been satisfied that militarized guards can safely join and choose unions representing other employees without impairing their loyalty to the United States or their ability to perform their military duties satisfactorily. We assume that attitude was adopted after a full consideration of all the military necessities, matters which are peculiarly within the competence and knowledge of the War Department. In light of that fact, it is impossible to say that a civilian agency erred in failing to insist upon what the military experts found to be unnecessary. To prohibit militarized guards from joining or choosing unions representing production and maintenance workers on grounds of military necessity is to erect limitations which not even those most familiar with the military situation thought essential or desirable. And in this nation, the statutory rights of citizens are not to be readily cut down on pleas of military necessity, especially pleas that are unsupported by military authorities. Certainly it would take more than the speculation and theories advanced by the court below to undermine the foundation of the policy adopted in this respect by the Board.

Moreover, the experience of the Board has revealed none of the dire consequences which the court below feared might flow from the application of the policy in question. 146 F. 2d at 722–723. In its brief before us, the Board has stated that it has certified bargaining representatives for

units of militarized guards in more than 105 cases; in more than 80 of these cases, the certified union also represented a separate bargaining unit of other employees of the same employer. Employer recognition of the unions, collective bargaining and contractual relations have resulted in many instances. Yet the Board states that it has received "no indication from any source that the dangers to the public interest and particularly to the war effort which the courts below thought to inhere in that policy have in fact materialized in any case."

One final matter remains. After the Board's order was issued and after the guards at respondent's Otis Works were demilitarized, the guards were deputized by the police authorities of the City of Cleveland. The Board claims that since this matter was not raised before it, the court below was precluded by § 10 (e) of the Act from considering the effect of the deputization upon the propriety of enforcing the Board's order. *Labor Board* v. *Newport News Co.*, 308 U. S. 241, 249–250; *Marshall Field & Co.* v. *Labor Board,* 318 U. S. 253; *Labor Board* v. *Cheney Lumber Co.,* 327 U. S. 385.

But the provision of § 10 (e), that "No objection that has not been urged before the Board, its member, agent or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances," quite obviously refers to objections that might have been but were not raised in the original proceeding before the Board. In this case, however, the deputization of the guards occurred after the Board had concluded its hearing and issued its order and after the court below had refused the first time to enforce the order. It was thus a matter which could not have been raised before the Board. And the failure of respondent to raise the then non-existent issue before the Board could not deprive the court below of power to

consider the issue once it did come into existence. See *Labor Board* v. *Blanton Co.*, 121 F. 2d 564, 571.

When circumstances do arise after the Board's order has been issued which may affect the propriety of enforcement of the order, the reviewing court has discretion to decide the matter itself or to remand it to the Board for further consideration. For example, where the order obviously has become moot, the court can deny enforcement without further ado; but where the matter is one involving complicated or disputed facts or questions of statutory policy, a remand to the Board is ordinarily in order. In this case, however, the Board and the respondent have stipulated the facts concerning the deputization of the guards. The only issue is whether the deputization is so inconsistent with the policies of the Act that the statutory guarantees must be denied to the guards and the enforcement of the Board's order refused. That issue is one normally to be determined by the Board in the first instance, it being the function of the Board rather than the courts initially to correlate the policies of the Act with conflicting interests. But we do not believe that a remand is necessary under the special circumstances of this case.

The Board has frequently considered the status of plant guards who have been deputized as deputy sheriffs or special police. Where the private employer retains the right to fix the wages, hours or other working conditions of such guards, the Board's uniform conclusion has been that they are employees of the private employer and that they retain their rights under the National Labor Relations Act. See, *e. g., Luckenbach Steamship Co.*, 2 N. L. R. B. 181, 189; *American-Hawaiian Steamship Co.*, 10 N. L. R. B. 1355, 1363–1364; *American Brass Co.*, 41 N. L. R. B. 783, 785; *Bethlehem-Fairfield Shipyard, Inc.*, 61 N. L. R. B. 901, 905–906; *Standard Steel Spring Co.*,

62 N. L. R. B. 660, 662–663. As in the case of militarized guards, the Board has found no evidence that when deputized guards join unions or engage in collective bargaining through freely chosen representatives their honesty, their loyalty to police authorities, or their competence to execute their police duties satisfactorily is undermined. It is sufficient, in the Board's judgment, to protect the special status of these guards by segregating them in separate bargaining units.

We find it impossible to say that the Board is wrong in adopting this policy as to deputized guards. It is a common practice in this country for private watchmen or guards to be vested with the powers of policemen, sheriffs or peace officers to protect the private property of their private employers. And when they are performing their police functions, they are acting as public officers and assume all the powers and liabilities attaching thereto. *Thornton* v. *Missouri Pacific R. Co.,* 42 Mo. App. 58; *Dempsey* v. *New York Central & Hudson River R. Co.,* 146 N. Y. 290, 40 N. E. 867; *McKain* v. *Baltimore & Ohio R. Co.,* 65 W. Va. 233, 64 S. E. 18; *Neallus* v. *Hutchinson Amusement Co.,* 126 Me. 469, 139 A. 671. But it has never been assumed that such deputized guards thereby cease to be employees of the company concerned or that they become municipal employees for all purposes. See *Chicago & N. W. R. Co.* v. *McKenna,* 74 F. 2d 155. Wages, hours, benefits and various other conditions of work normally remain subject to determination by the private employers. At least as to those matters, the deputized guards remain employees of the private employers. See *Walling* v. *Merchants Police Service,* 59 F. Supp. 873. Hence they may be held to be employees within the meaning of § 2 (3) of the National Labor Relations Act. *Labor Board* v. *Hearst Publications,* 322 U. S. 111.

Deputized guards bear the same relationship to management that non-deputized guards bear, a relationship that we discussed in the *Atkins* case, *ante*, p. 398, and that we found to be adequate for the Board to find the existence of an employer-employee status. Likewise, their relationship to police or municipal authorities is not one that is necessarily inconsistent with their status as employees under the Act. Union membership and collective bargaining are capable of being molded to fit the special responsibilities of deputized plant guards and we cannot assume, as a proposition of law, that they will not be so molded. If there is any danger that particular deputized guards may not faithfully perform their obligations to the public, the remedy is to be found other than in the wholesale denial to all deputized guards of their statutory right to join unions and to choose freely their bargaining agents. The state and municipal authorities, in short, have adequate means of punishing infidelity and assuring full police protection.

We find nothing in the instant case which would make inapplicable the Board's policy with respect to deputized guards, and the Board has so argued before us. The stipulated facts reveal that the guards at respondent's Otis Works were commissioned as private policemen of the City of Cleveland under § 188 of the Cleveland Municipal Code (1924), and as such are members of the municipal police force and exercise the legal powers of peace officers in their work as plant guards. They are under the control of a police captain and his lieutenants, the police captain being directly responsible to respondent's director of plant security at Pittsburgh and to respondent's executive officer in general charge of the Otis Works. The police captain is also a deputy sheriff of Cuyahoga County, Ohio. It is not denied that the guards continue to be paid by respondent and that their hours, benefits and other conditions of work remain the responsibility of respondent.

The court below pointed out that the Ohio law on the status and duties of special policemen is in accord with the general rule which we have noted. In other words, special policemen are public officers when performing their public duties. *New York, Chicago & St. Louis R. Co.* v. *Fieback,* 87 Ohio St. 254, 100 N. E. 889; *Pennsylvania R. Co.* v. *Deal,* 116 Ohio St. 408, 156 N. E. 502. But none of the Ohio cases attempts to say that the public status of special policemen destroys completely their private status as employees of individual companies. Nor is there any basis for the intimation that their public duties are such as to render incompatible the recognition of rights under the National Labor Relations Act.

We therefore conclude that the facts and the law are sufficiently clear to justify a determination that the guards at respondent's Otis Works are employees within the meaning of the Act despite their deputization as municipal policemen. And they have as much right to select as their bargaining agent a union which represents production and maintenance workers as have militarized guards, the same considerations being applicable. It is obvious that the Board would apply such a policy to this case, thereby making a remand to the Board a mere formality and a needless addition to an already over-prolonged proceeding. Under such circumstances, a remand to the Board is unnecessary.

It follows that the court below should have enforced the Board's order.

*Reversed.*

THE CHIEF JUSTICE, MR. JUSTICE FRANKFURTER, MR. JUSTICE JACKSON and MR. JUSTICE BURTON dissent substantially for the reasons set forth in the opinion of the court below, 154 F. 2d 932.