DeCARLO, Judge.
Assaulting a peace officer with a deadly instrument; ten years.
During the spring term of its 1975 session, the Shelby County grand jury returned separate indictments against the appellants, charging that each “. . did unlawfully assault a peace officer, or a law enforcement officer of this state or political subdivision thereof while in the active discharge of his lawful duty or duties with a deadly instrument to-wit: a shotgun
To these indictments, each pled not guilty at arraignment with their counsel present. Prior to trial, a stipulation was made that the defendants would be tried jointly. A trial was had and each was convicted as charged. After being adjudged guilty separately, each was sentenced to ten years and notice of appeal was given.
In support of these charges against the appellants, the State presented the following evidence:
It appears that the alleged offense occurred on a stretch of track held by the Louisville and Nashville Railroad, under an easement. The site was about one and one-half miles from Highway 52, on what is called the Helena and Blockton Branch Line in Shelby County.
On December 13,1974, at 1:30 P. M., G. T. Hollis, an L & N Railroad policeman, drove to Shelby County. Hollis was alone at the time and he parked his car on a road about one mile south of Highway 52. Dressed in green coveralls and carrying a loaded 12 *604 gauge pump shotgun, Hollis walked down the old railway roadbed to an area where some rails had been cut and removed. He stated that about two weeks before the incident he had gone to the same area and discovered missing rails. As he approached the area he saw a yellow pick-up truck parked on the railroad roadbed.
Standing about one hundred feet behind the truck were three men. The first was the appellant, Hill, who was walking toward the truck, carrying what appeared to be a piece of rail. The second man was standing near the truck and was the man Hollis later learned to be Key. The third man was the appellant, Pitchford, who was standing over a rail, cutting it with an acetylene torch.
As Hollis walked to within thirty feet of the trio, he called out that they were under arrest and identified himself as a railroad policeman. He shouted for them to stand and place their hands on their heads. The command was repeated several times and Hill and Key responded. Pitchford continued to cut the rails. At that point, Key went over to Pitchford, touched him on the shoulder and said: “ ‘Bill, the man said, stop.’ ” Pitchford then got up and turned to Hollis and asked if he could “cut the tanks off.” When the torch was extinguished, Pitchford asked Hollis what department “he was with.” Again Hollis repeated his name and that he worked for L & N as a railway policeman. The trio then placed their hands over their heads. They were told to lie down and Hollis walked over to where Hill was lying. As Hollis tried to handcuff him with a plastic tape, Hill lurched and grabbed the barrel of the shotgun. They struggled and Hill called to Pitchford: “Hey, Bill, come help me, I got him.” Pitchford came around behind Hollis and grabbed the gun. At that time both of the men were standing over Hollis when the gun discharged, hitting Key in the leg. Hollis was momentarily knocked out and when he revived, Pitchford was standing on the other side of the tracks, pointing the gun at him. Appellant pulled the trigger four or five times, but the gun would not fire. Pitchford called to the others: “ ‘Do you all dare me to shoot him? ’ ”, and Hill, who was assisting Key, replied “ ‘Bill, I dare you to shoot . . . shoot the son-of-a-bitch.’ ”
Pitchford turned to Hollis and said, “ ‘Don’t move your hands from where they are and roll down (the) bank.’ ” As Hollis rolled down the bank he did not see Pitch-ford eject a shell but heard him pump the shotgun. Almost immediately, the gun fired and three pellets struck Hollis in the rear portion of his left arm. Hollis was stunned and subsequently, staggered to the edge of Helena dump road, where he was discovered. He was carried to Shelby County Hospital and later to St. Vincent’s in Birmingham.
During cross-examination, Hollis denied hitting Hill with the shotgun or using profanity at any time during the incident. He admitted that he did not have a badge exhibited but countered he was working as a detective. Further, Hollis maintained his shout had been heard because the trio responded.
Hollis stated the track had not been used by the L & N for eight years other than for maintaining a right-of-way. He said the line was useable, but this was not possible now because rails had been stolen.
Hollis also testified that trees six to eight inches around were growing between the tracks, and debris covered the bed area. He stated that ninety percent of the ties needed to be replaced. According to Hollis, on the north end of the line, the railroad had given the State permission to pave over the rails crossing Highway 52. Further, he explained, a bridge had been destroyed by fire, and the south end of the line ran to a dead end.
Hollis identified the indenture passing Birmingham Mineral Railroad Company’s interest in this section of track to the L & N Railroad Company. The Eureka Company originally passed title to the Birmingham Mineral Railroad Company with the following condition:
*605 “To have and to hold the above conveyed easement unto the said party of the second part its successor and assigns, so long as the same is used for its railroad and no longer.”
He explained he was not aware that his railroad policeman’s commission was required by law to be filed with Shelby County, but said he carried the commission card in his pocket. Although he was not a member of a police department, Hollis said he considered himself a detective, salaried by the L & N.
Larry Edmunson, a former deputy sheriff for Shelby County, was operating a construction and excavating company on December 13, 1974. That afternoon while on his way to the Helena dump in Shelby County, he saw Hollis staggering in the woods just off the road. Hollis said “he was hurt” and Edmunson observed blood on his arm. He laid Hollis down and later carried him to the Shelby County Hospital.
Dr. Thomas McGruder, a licensed physician, specializing in general surgery, testified that on December 13, 1974, he saw Hollis in the emergency room of St. Vincent’s Hospital. He stated the upper portion of Hollis’ left arm had two wounds in the rear with a larger wound in the front. Some nerves to Hollis’ hand were damaged and according to Dr. McGruder, they were surgically repaired by Dr. Sweeney.
J. P. Vaughan, the division engineer for the L & N, was in charge of maintenance of tracks, buildings, bridges, signals and communications. He testified that the Wednesday before Thanksgiving of 1974, he walked from Gurney Junction to the vicinity of Milepost 411, on the line in question. A quarter of a mile beyond the mile post, he found the rail missing for one or one and one-half miles.
Vaughan, on cross-examination, admitted that the crossing on Highway 52 had been paved over for five or six years, but explained estimates had been made on the cost for placing the line in operation. Vaughan went on to say that the company was using the line for a railroad and was maintaining a right-of-way for future use.
James Howell, an evidence technician with the Jefferson County Sheriff’s Department, met a representative of the L & N Railroad on December 13, 1974, at the Alabaster Police Department. From there they drove to very near an area where he saw “layers” of rails had been cut. He made photographs of the area and retrieved acetylene torches, cigarette packs, coveralls, goggles and a pair of eye glasses. These items were dusted for prints but the comparisons were negative.
Bill Davenport, a Shelby County Deputy Sheriff, was called to the Shelby County Memorial Hospital on December 13, 1974, where he saw Hollis in the emergency room.
Later he was directed by the attorneys for the defendants to the area where the shotgun belonging to Hollis was located. There were three unfired shells and one fired hull in the gun. The shells were removed and the gun was subsequently returned to Hollis.
Davenport stated that several days after the incident, the two defendants were surrendered to the authorities by their attorney, J. Wilson Dinsmore.
Wallace Tidmore, the Secretary of the Public Service Commission, since March 1, 1968, testified that as secretary, he was also custodian of records kept in the course of the commission’s business. Tidmore produced a copy of a certificate dated October 2, 1967, commissioning G. T. Hollis as a railroad policeman. He also showed a copy of an oath of office and bond executed by Hollis.
Appearing on the certificate of commission was a statement signed by the Secretary of the Commission, Orvill P. Large, stating a copy of the certificate had been sent to the counties where the railroad operated.
Thomas Snowden, Tax Assessor of Shelby County, testified that the public utility assessment records for 1974-75, indicated 9.96 miles of L & N’s track designated the Hele *606 na and Blockton Roads were assessed at $29,900. He stated the taxes would be about $900. and that L & N had paid the taxes on the track.
At the end of Snowden’s testimony, the State’s case was completed. After a motion to exclude was overruled, the defendants called Louis J. Harris. He had lived in Siluria, Alabama, for forty years and was familiar with the railroad running from Gurney Junction to Highway 52.
Harris testified that “Boothtern mine” was located at the Gurney Junction end of the line and the stretch of tracks was a “coal mine spur” belonging to L & N. He stated the mine had closed in 1949, and had moved its equipment in 1950. He recalled picking blackberries along the line in the “fifties” and that the area was “growed up.”
Tommy Watts, Bill Pitchford’s son-in-law and neighbor, testified that he had seen the appellant handle a pump shotgun on many occasions and that he was a “pretty good shot.”
Rufus Green also testified to Bill Pitch-ford’s accuracy with a shotgun.
Conrad M. Fowler, the Shelby County Probate Judge, was called by the defense and testified that copies of railway policemen commissions are filed in the probate judge’s office but not recorded. He explained that when the commissions are received, they are stamped with the date and placed in a file, labeled “Railway Policemen.” Judge Fowler stated a search had been made and no commission belonging to G. T. Hollis was found. On further questioning, he said there had been many changes in the probate judge’s office since 1967, and remarked: “We don’t say it is not there, we just haven’t found it.”
Thomas Snowden, the tax assessor, was recalled by the defense and testified that the record in the assessor’s office showed that the Helena and Blockton track was not in operation. Further, he said that the 9.96 miles of track designated, Helena and Blockton road, was assessed and the taxes paid by the L & N. Snowden explained if the taxes had not been paid, the tax assessor’s office would not prepare an assessment for the property.
William Pitchford testified that on December 13, 1974, he rode with Joe Ed Hill and Charles Key to the area where the shooting occurred. Hill drove the truck along the roadbed and they had to cut trees for about six hours in order to get to the scene. After the trees were cleared, they began cutting the rails into four-foot sections. About twenty-five or thirty “cuts” were made before Hill tapped him on the shoulder. When he stood up, he saw Hollis with a shotgun pointed at him. Hollis said: “ ‘. . . line up and don’t move or I’ll blow your damn head off.’ ” Pitchford said they were told to lie down and he did.
When Hill attempted to lie down, Hollis hit him in the head with the gun barrel, and when Hollis attempted to tie Hill’s hands with what appeared to be a roll of adhesive tape, Hill grabbed the gun and the two began to struggle over it. Someone hollered and Charles Key got up and moved in the direction where Hill and Hollis were struggling. At that point, the gun fired, striking Key in the leg. Key began to holler and Pitchford went over to where the two men were struggling. He testified: “I went over then . . talked . I didn’t know who the man was, whatsoever, I went to try to defend myself, because he already told me, he was going to blow my head off. ... to try to get the gun.”
After taking the gun from Hollis, Pitch-ford told him: “ ‘just go on’ . . . ‘just go on down that bank, we don’t want no problems here.’ ” Pitchford remarked he had to tell Hollis two or three times to go down the bank. He denied pointing the gun at Hollis and trying to pull the trigger. Pitchford explained he knew how to eject shells and that he was holding the gun down by his side. He added that when he tried to eject the shell, the “gun went off,” “. . .1 fired the gun but I didn’t go to it went off.” Pitchford stated that Hollis ran down the bank into the bushes, and: “I didn’t know I shot him.”
*607 After the shooting, Hill and Pitchford placed Key in the truck and they drove out of the area. While driving out, Hill said the “man” told him that he was a railway agent. Pitchford said he was frightened and they threw the tanks, torches and shotgun on the side of the road.
About five weeks after the shooting, Pitchford surrendered to the authorities.
Bobby Nell Hardin, Bill Pitchford’s sister, was the last defense witness. She testified that on several occasions railroad detectives came to her house in search of her brother.
I
When the appellants made their motion to exclude the State’s evidence, they assigned the following grounds:
First, the prosecution had failed to prove Hollis was a railroad policeman, or had complied with § 216 of T. 48, Code of Alabama 1940, Recompiled 1958;
Second, it was not shown that the shooting occurred on premises belonging to the railroad; and
Third, Hollis was not a peace officer within the meaning of T. 14, § 374(20), Code of Alabama 1940, Recompiled 1958, 1973 Cum.Supp. to Vol. Five, which is the statute upon which the indictments were based.
The statutes pertaining to the issue raised by the first ground assigned in support of defendants’ motion to exclude are T. 48, §§ 214, 215, 216 and 217, Code of Alabama 1940, Recompiled 1958, which read:
“§ 214. Application for appointment.— Any company or corporation operating a railway or street railway may apply through one of its executive officers to the governor to commission such number of its agents, servants or employees as said corporation shall designate to act as policemen for said corporation.
“§ 215. Governor appoints. — The governor, upon such application, may appoint such person, if he sees proper, in his discretion, to make any appointment, or so many of them as he may deem proper to be such policemen, and shall issue to such person or persons so appointed a commission to act as such policemen.
“§ 216. Bond and oath of policemen.— Every policeman so appointed shall, before entering upon the duties of his office, take and subscribe the usual oath, and enter into bond in the sum of five hundred dollars, payable to the State of Alabama, conditioned for the faithful performance of the duties of his said office, with good and sufficient surety to be approved by the public service commission. Such oath of office and such bond, with a copy of the commission, shall be filed with the public service commission, and a certificate by the secretary of such commission of such appointment and compliance with the foregoing provisions of this section, shall be filed with the probate judge of each county in Alabama in, into or through which the railroad for which such policeman is appointed may run, and of such other counties in Alabama, if shown in the aforesaid application of such company or corporation, in which the company may be engaged in work and in which it is intended that said policeman may act.
“§ 217. Powers of. — Such policemen, while acting for and in the capacity of agent, servant or employee of said company or corporation, shall severally possess within the limits of the county all the powers of a policeman in the several towns, cities and villages in which he shall be authorized to act as aforesaid; but such railway policeman shall have no authority to make any arrest except for an offense committed on the cars or premises of the corporation, upon whose petition he was appointed.”
In particular, appellants insist it was not shown that Hollis had filed the Public Service Commission’s certificate, showing his appointment as a railway policeman, with the probate judge of Shelby County.
The factual situation involving this question shows:
1) That the Secretary of the Public Service Commission testified he was the custodian of the Commission’s records. He pro *608 duced a certificate of commission as a railway policeman for Hollis, issued October 1, 1967, and signed by the Secretary of the Commission, at that time, Orvill Large. At the bottom of the certificate, a statement by the Secretary of the Commission indicated a copy of this certificate was filed with the probate judge of counties where the railroad operated.
2) Conrad Fowler, Probate Judge of Shelby County, stated he had made a search for the certificate of commission and was unable to find it, but added he could not say it was not there.
Under § 216, T. 48, supra, once Hollis was appointed by the governor, he entered upon his duties as a railway policeman by taking and subscribing the usual oath and entering into a bond in the sum of five hundred dollars, payable to the State of Alabama. At that point he was a legally constituted railway policeman, empowered to act in all counties where the railroad operated. The filing of the certificates by the Secretary of the Public Service Commission of such appointment, indicating a compliance with the foregoing provisions as to the oath and bond, is ministerial, and not a condition precedent to his assumption of office.
The second ground assigned in support of defendants’ motion to exclude involves the question whether the site of the shooting was in fact the premises of the railroad.
It was contended that the right-of-way had been abandoned and title thereto had reverted. The contention was based on the fact the L & N’s right-of-way was subject to the condition it be used as a railroad. Appellants’ elicited testimony concerning the track being paved over at one end and the roadbed having fallen into disuse. It was also pointed out that trees, five to eight inches in diameter, had grown between the rails.
While the facts indicated the line had not been used in some twenty years, the testimony of the Shelby County Tax Assessor showed the land was assessed and the railroad was paying taxes on it as part of their holdings in Shelby County. There was also testimony concerning a study made to determine the cost of putting the line back in operation. Further, Vaughn and Hollis stating they walked the line, indicated the railroad’s interest in protecting its right-of-way.
The law is clear in Alabama that the mere nonuse of an easement, for whatever period, will not of itself effect an abandonment or terminate the interest. The question is for the jury and the essence of the inquiry is the owner’s intentions. Lapse of time and nonuse are evidentiary of the owner’s intentions, but must be considered with other evidence of such intentions. Alabama Power Company v. Daily, 31 Ala.App. 441, 18 So.2d 142.
The facts outlined above presented a question for the jury.
Defendant’s final insistence in support of the motion to exclude was that Hollis was not a peace officer within the purview of T. 14, § 374(20), supra, which reads:
“Assault with a deadly instrument upon peace officer in performance of his duties. — Whenever any peace officer or other law-enforcement officer of this state or any political subdivision of this state shall be engaged in the active discharge of his lawful duty or duties, it shall be unlawful for any person to commit any assault with a deadly instrument upon such officer, and any person guilty of such assault with a deadly instrument shall be guilty of a felony, and upon conviction shall be imprisoned in the penitentiary for not less than two years nor more than twenty years.”
The Supreme Court stated in NLRB v. Jones & Laughlin Steel Corp., 331 U.S. 416, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947):
“It is a common practice in this country for private watchmen or guards to be vested with the powers of policemen, sheriffs or peace officers to protect the private property of their private employers. And when they are performing their police functions, they are acting as public officers and assume all the powers and *609 liabilities attaching thereto.” (Citations omitted.)
In accordance with this view we believe that while on duty and in his prescribed area of authority, a railway policeman is a peace officer within the meaning of T. 14, § 374(20), supra.
The court’s action in overruling the motion to exclude was correct.
Further, we find there was evidence the appellants aided and encouraged each other in this offense. Stokley v. State, 254 Ala. 534, 49 So.2d 284; Ray v. State, 32 Ala.App. 556, 28 So.2d 116. The evidence was properly submitted for the jury’s consideration.
II
Appellants complain that the court abused its discretion when it allowed Vaughn to give his opinion regarding: “. . . why are rails left in the roadbed?”
Vaughan, the Division Engineer for the L & N, was in charge of maintenance of tracks, buildings, bridges, signals and communications. He stated he was familiar with the branch-line where the incident occurred and that he had walked it on a few occasions. The last occasion was on the Wednesday before Thanksgiving of 1974.
During the trial he identified an “evaluation map” of the area and stated it showed the right-of-way and a brief description of its ownership. Further, Vaughn testified he was familiar with the legal description of the area in question.
Based upon his knowledge as the division engineer and his experience in that capacity for seventeen years, we believe Vaughn could give his opinion of why the rails were left in the roadbed.
III
We find no error in allowing Hollis to answer the question: “Do you hold an appointment as a policeman or a law enforcement officer for the L & N Railroad Company?” During the trial, Hollis identified a certificate of commission, indicating his appointment as a railway policeman for the L & N, and stated he had a card showing his commission.
Under these circumstances we believe the testimony was admissible.
IV
The exhibiting of wounds and allowing medical testimony concerning them were not error. In Haney v. State, 20 Ala.App. 236, 101 So. 533, it was said the extent of injuries was proper subject of inquiry bearing on the issue of whether or not there was intent to kill. Bone v. State, 25 Ala.App. 96, 142 So. 437; Elmore v. State, 26 Ala.App. 290, 158 So. 771.
V
Appellants maintain the court invaded the province of the jury when in the oral charge the judge stated it was the judgment of the court, that as a matter of law, Hollis was acting as a law enforcement officer at the time the incident occurred.
In view of the evidence recited above concerning Hollis’ appointment as a railway policeman, we believe the court was correct in making such a finding.
VI
Counsel for appellants complains the court erred in allowing parol evidence by Hollis as to the ownership of the property where the incident occurred.
Our review of the record indicates that Hollis had been on this property several times over the past eight years. During the trial he identified maps showing this area and stated the railroad had been paying taxes on this particular land.
Based on his personal knowledge and familiarity with the area, we believe his testimony was permissible.
VII
Appellants claim they were denied a public trial when the court allowed the *610 prosecution to subpoena most of Pitchford s family and have them excluded under the rule of sequestration.
The choice of witnesses to be subpoenaed by the prosecution cannot be limited, just as it cannot be limited to appellant. Once the witnesses are chosen, their exclusion from the courtroom is within the trial court’s discretion. Patterson v. State, 53 Ala.App. 567, 302 So.2d 540.
VIII
It is insisted appellants’ sixth amendment right to be informed of the nature and cause of the accusations against them was impaired. Counsel argues that the indictment encompassing the charges against the appellants did not name the officer alleged to have been assaulted.
This point was not raised by demurrer to the indictment and is presented for the first time on appeal.
We are satisfied that no injury resulted to the defendants from the omission of the assaulted officer’s name. The evidence without dispute, showed G. T. Hollis was the one shot and that he was a duly commissioned railway policeman. See: Gaines v. State, 146 Ala. 16, 41 So. 865.
IX
Counsel for appellants alleged the court erred in allowing the jury to separate during recess and overnight without an agreement by the defendant. This point of alleged error was not established by an objection, motion for mistrial, or by a motion for new trial. Without some adverse ruling regarding this issue, this court has nothing before it for consideration. Turner v. State, 54 Ala.App. 467, 309 So.2d 503.
X
We examined each of the fifty-one written charges refused the defendants and have found they were either covered by the oral charge, were abstract, confusing, misleading, invasive, not predicated on the evidence, or not supported by the law. In our judgment, the refusal of these charges was correct.
We have searched the record and did not find any error.
AFFIRMED.
TYSON, HARRIS and BOOKOUT, JJ., concur.