**NATIONAL LABOR RELATIONS BOARD,**
Petitioner-Cross-Respondent,

and

**New York State Nurses Association,**
Intervenor,

v.

**NORTH SHORE UNIVERSITY HOSPITAL, Respondent-Cross-Petitioner.**

Nos. 693, 694, Dockets 82–4127, 82–4139.

United States Court of Appeals,
Second Circuit.

Argued Jan. 3, 1983.

Decided Dec. 8, 1983.

Linda Dreeben, Washington, D.C. (Howard E. Perlstein, William A. Lubbers, John E. Higgins, Jr., Robert E. Allen, Elliott Moore, N.L.R.B., Washington, D.C., of counsel), for petitioner-cross-respondent.

Jesse Climenko, New York City (Peter D. Stergios, Jerrold F. Goldberg, Shea & Gould, New York City, of counsel), for respondent-cross-petitioner.

Richard J. Silber, Harder, Silber & Gillen, Albany, N.Y., for intervenor.

Before KEARSE, WINTER and PRATT, Circuit Judges.

WINTER, Circuit Judge:

This case involves a petition for enforcement by the National Labor Relations Board of an order directing respondent North Shore University Hospital to bargain with New York State Nurses Association ("SNA") as the certified bargaining representative of the nonsupervisory registered nurses employed by the Hospital. The Hospital has cross-petitioned for review.

At an election conducted by the Board among North Shore Hospital's nonsupervisory nurses on November 16, 1977, SNA, a professional organization of registered nurses, was selected as a bargaining representative by a vote of 368 to 96. The Hospital filed objections to the election, asserting that SNA was not qualified to be a bargaining representative "because its actions are controlled, directed and/or influenced by persons who occupy supervisory positions within health care institutions," including North Shore Hospital. Because this was not an appropriate objection to the election, the Board certified SNA as the exclusive representative of the Hospital's nonsupervisory registered nurses and SNA

requested the Hospital to bargain. The Hospital refused.

Thereafter, the Board's General Counsel issued an unfair labor practice complaint and North Shore Hospital again claimed that SNA is "controlled ... dominated and/or influenced" by supervisors. After a hearing, the Administrative Law Judge ("ALJ") rejected the Hospital's arguments and found that it had violated Sections 8(a)(5) and (1) of the National Labor Relations Act ("Act"), 29 U.S.C. §§ 158(a)(5) and 158(a)(1) by refusing to bargain with SNA. The Board affirmed and entered the usual order. We deny enforcement and remand.

## BACKGROUND

SNA is a non-profit, professional membership organization of registered nurses, which operates a variety of programs related to nursing and the care of the sick. One of these programs, Economic and General Welfare ("EGW"), includes a collective bargaining component for member nurses. At the time of the hearing below, SNA had some 29,000 members, 25,000 of whom were represented by SNA for collective bargaining purposes in approximately 115 bargaining units at public and private health care facilities throughout New York State. SNA admits both supervisors and nonsupervisory nurses to membership, all members having equal privileges.

SNA is governed by a thirteen-member board of directors elected by the membership. SNA's executive and program staff is made up of full-time employees, including program directors, regional coordinators, nursing representatives and labor relations representatives.

SNA divides New York State into four geographic regions for purposes of implementing the EGW program, and each region is further subdivided into districts. North Shore Hospital is within District 14, which, *inter alia,* compiles area wage and practice surveys containing information about working conditions for nurses in the District. The SNA staff provides bargaining units of nurses with technical assistance in the form of suggested model rules or guidelines with respect to the organization of bargaining units. After discussing with SNA staff its own particular needs, a unit adopts its own rules.

While unit nurses do not submit bargaining proposals to the SNA for approval, they frequently develop specific proposals in their initial meetings with SNA staff members. Contract negotiations are conducted by a negotiating committee elected from the unit membership. The SNA representative assists and frequently functions as the primary negotiator on behalf of the unit, although a member of the local unit may handle negotiations relating to a particular proposal.

The authority of SNA staff to negotiate on behalf of the unit is limited by the ultimate power of the unit to adopt or reject negotiating proposals, although SNA staff often advise the unit on the likelihood of success in negotiating particular proposals. Unit members must ratify any agreement.

The facts which give rise to the legal issues before us involve the role of supervisors in SNA. Since SNA is a professional organization of registered nurses performing numerous functions of interest to nurses in addition to collective bargaining, it is to be expected that nurses who join early in their careers and subsequently become supervisors are likely to retain membership in SNA.

The record shows that supervisors are very active in SNA's affairs. For example, SNA's board of directors, its ultimate governing authority, is elected by the membership and includes supervisors. At the time of the election at North Shore Hospital, SNA's five-person nominating committee, which prepares slates of candidates for SNA offices, had two supervisors as members, including as chairperson Catherine Foster, a supervisor at North Shore Hospital. At least three supervisors served on a six-member special committee created in 1976 to study a possible restructuring of SNA's collective bargaining arm to avoid

potential conflicts of interest for directors of nursing services participating in SNA. The committee recommended that "full participation by Directors of Nursing" in SNA be continued, that legal assistance be provided to any director of nursing forced to resign from membership, and that a model employment contract for directors of nursing be developed to assist them in securing such contracts. In the same year, the SNA board appointed a "Task Force on Impediments to Quality Nursing Care" to prepare a report concerning SNA's no-strike policy. It included supervisors as members. A seven-member council on the EGW program serves, pursuant to SNA's bylaws, in an advisory capacity to the board of directors. Supervisory or managerial employees serve on the council. Finally, the president of District 14 at the time of the election was North Shore's supervisory nurse, Catherine Foster. In October, 1977, she presided over a district meeting of nursing directors which discussed the need to pour more of SNA's resources into the EGW program in order to head off competing organizational efforts by another union, Local 1199.

The ALJ rejected North Shore's claim that SNA is so dominated by supervisors that it should not be certified. Applying the Board's test set out in *Sierra Vista Hospital, Inc.,* 241 N.L.R.B. 631 (1979), the ALJ held that the Hospital had not carried the "burden . . . of showing that danger of a conflict of interest interfering with the collective bargaining process is clear and present." Emphasizing that a "direct" conflict of interest in the case of North Shore Hospital's supervisors had not been shown since there was no evidence of a connection between North Shore Hospital and supervisor members of SNA's board, the ALJ rejected the Hospital's contention. The Board affirmed.

## DISCUSSION

We are confronted here with a situation in which two normally consistent policies of the Act conflict. On the one hand, the freedom of choice by the employees to select a particular bargaining representative or none at all is a core policy of the Act. See *NLRB v. Jones & Laughlin Steel Corp.,* 331 U.S. 416, 425–26, 67 S.Ct. 1274, 1279–80, 91 L.Ed. 1575 (1947); *Bell & Howell Co. v. NLRB,* 598 F.2d 136, 145–46 (D.C.Cir.), cert. denied, 442 U.S. 942, 99 S.Ct. 2885, 61 L.Ed.2d 312 (1979). On the other, Section 8(a)(2) of the Act limits the influence of agents of the employer such as supervisors upon such bargaining representatives to ensure that collective bargaining is truly at arms length. 29 U.S.C. § 158(a)(2).[1] While the typical industrial union rarely encounters a problem in this regard, these policies may conflict when employees choose as a bargaining representative a professional organization such as SNA in which supervisors are entitled to full membership privileges and participate actively as officers and committee members.

All agree that certain degrees of supervisory influence within an organization may be so great that it will be unable to qualify as a bargaining representative. See *NLRB v. Link-Belt Co.,* 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368 (1941); *District 65, Distributive Workers of America v. NLRB,* 593 F.2d 1155 (D.C.Cir.1978); *NLRB v. Kropp Forge Co.,* 178 F.2d 822 (7th Cir.1949), cert. denied, 340 U.S. 810, 71 S.Ct. 36, 95 L.Ed. 595 (1950). Indeed, a major purpose of Section 8(a)(2), appears to have been the elimination of the celebrated "company-dominated union," *Hertzka & Knowles v. NLRB,* 503 F.2d 625, 630 (9th Cir.1974) (quoting legislative history of Section 8(a)(2)), once prevalent as an anti-union device but now only an occasional curiosity, and employer domination of a bargaining representative will justify disestablishment of the organization. See *Virginia Electric Co. v. NLRB,* 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943); *NLRB v. Link-Belt Co., supra.* Although the company union may be largely a thing

---

1. 29 U.S.C. § 158(a)(2) reads in relevant part:
   (a) It shall be an unfair labor practice for an employer—

   (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it . . .

of the past, the policy against it remains and the question before us is the extent to which, as a consequence of that policy, supervisory influence may disqualify a multipurpose professional organization from representing rank and file employees in collective bargaining.

We agree with the Board that the fact that supervisors are members of such an organization does not automatically disqualify it as a statutory bargaining representative. We also agree that unless there is "clear and present danger" of "a conflict of interest interfering with the collective bargaining process," resort to disqualification is inappropriate. *Sierra Vista, supra.* However, we disagree with the Board's application of the *Sierra Vista* test in the circumstances of the present case because it limits the inquiry as to a conflict of interest to proof of explicit supervisory interference in the case of the particular bargaining unit before it. While that narrow inquiry may be appropriate in the case of an organization representing the employees of one employer in an industrial context, it is inadequate to effectuate the policies of the Act in the case of a multipurpose professional organization representing thousands of employees in numerous bargaining units. We believe that in the latter case the inquiry must extend to all relevant circumstances, including the governing structure and actual practice of the organization seeking certification as a bargaining representative so far as participation by supervisors is concerned. We, therefore, decline to enforce the Board's order and remand for further proceedings.

We conclude that the governing structure and actual practices are important for several reasons. First, supervisors who participate actively in a professional organization which represents (or is seeking to represent) rank and file employees who serve under them, are by the very nature of their relationship to their employer and to the professional organization subject to conflicting pressures. Since these are the two most important entities affecting their career, the existence of a conflict of interest both within the organization and on the job is indisputable. It is the existence of the conflict, moreover, not whether in particular instances a supervisor resolves it in favor of the organization, the employees or the employer, which is of importance. To be sure, the degree of conflict may vary from case to case but that will in large part be determined by the structure of the professional organization and the extent to which the collective bargaining component is insulated from the governance of the organization.

Second, supervisors as a class have interests of their own and an organization which is itself governed in part by supervisors will tend to reflect at least in part those interests. For example, the authority of supervisors vis a vis rank and file employees is usually a major issue in collective bargaining. An organization in which supervisors play a significant governing role will have difficulty in isolating and reflecting only the views of the rank and file on that issue. Staff of the professional organization who are employed at the pleasure of a board of directors containing supervisors cannot easily cast aside the knowledge that supervisory employees have a say in their own employment when they advise employees on bargaining positions and negotiate on their behalf. Moreover, it is tunnel vision to assume that this influence will be of importance only when a supervisor of employees in a particular unit is a member of the board of directors of the certified bargaining representative.

Third, evidence of explicit interference in collective bargaining of the kind demanded by the Board may not be available even in cases in which the structure of a professional organization leads to a pervasive supervisory influence. When supervisors and employees are not members in a common union, the former can usually influence union affairs only through job-related activities. Where active membership is shared, such influence may be internalized in the normal course of union affairs and not be subject to direct proof. For example, supervisors may not only have control over an employee's

working conditions but may also be able to affect the employee's role in the professional organization. Indeed, the more pervasive that influence is, the more difficult it may be to prove simply because the rank and file acquiesces. The *Sierra Vista* rule may thus be more efficient at singling out cases in which the rank and file in a particular unit actually contests the influence of supervisors than in cases in which it is pervasive.

Fourth, where supervisors are active in the internal affairs of a bargaining representative, actual violations of Section 8(a)(2) attributable to employers seem inevitable. Consider, for example, Professor Gorman's description of the Board's present caselaw on the subject:

> In itself, retention of union membership by supervisors is not illegal. But it is illegal for supervisors to serve as union officials or on a union bargaining team, ... or ... even to vote in elections for union officers, since the supervisors might have the balance of power in a close election and could therefore select union officials who will later deal with them in their capacity as employer representatives.
>
> ... The Board has held that it is unlawful for a supervisor to vote in an election of a delegate to be sent by the local union to the annual convention of the international, since that delegate may at the international meeting shape a policy which will affect the local in its dealings with the employer. It has even been suggested that the supervisor/union-member may not speak out on contentious issues at union meetings, since this will stifle the expression of opposing views by rank-and-file employees who may fear for their job security at the hands of the supervisor.
>
> In all of these cases, it will be no defense to a finding of "interference" that the activities of the supervisors were carried on without the express authorization or ratification of the employer, or that the supervisors were acting in what they believed in good faith to be the best interests of the union.

R. Gorman, *Labor Law* 199–200 (1976) (citations omitted).

We believe it reasonably obvious that if the legal rules reflected in this caselaw are applied to the Hospital, certifying SNA as a bargaining representative without more will inexorably lead to systematic violations of Section 8(a)(2) chargeable to North Shore Hospital. Neither the Board nor SNA deny that the active role of supervisors in SNA affairs may cause the Hospital to violate Section 8(a)(2). Rather, they argue that the activities of supervisors in SNA are not so egregious as to override the free choice of the Hospital's nurses and to deny certification to SNA. This argument might well be persuasive if either the Board or SNA demonstrated any readiness to help prevent such violations. Instead, however, they profess their own lack of responsibility and state that it is up to the Hospital and the Hospital alone to prevent its supervisors from violating Section 8(a)(2) through their activities in SNA.

We reject this cavalier view of the Board's role under the Act. Having primary enforcement responsibility and full power to bring charges on its own, the Board ought not acquiesce in situations in which violations seem so probable. Moreover, it is clear that North Shore Hospital alone cannot be—or at least ought not be—counted on to prevent such violations. By ordering it to bargain, the Board seeks to place the Hospital in a situation in which it must work toward an agreement with SNA. Progress in that direction, however, will not be furthered by requiring that the Hospital also seek a confrontation with part of the SNA establishment by attempting to limit the activities of its supervisors in that organization and perhaps by firing them as suggested by the Board in its brief. Brief for Petitioner at 47.

We conclude, therefore, that the Board's refusal to look to the general structure and practices of organizations such as SNA is not consistent with the policies of the Act. While it may be adequate in the case of an organization representing the employees of

a single employer in an industrial context, the narrow inquiry of *Sierra Vista* is more useful for avoiding the complex issues raised by bargaining by multi-purpose professional organizations than for resolving them. Indeed, under the *Sierra Vista* test, some of the most cogent evidence relating to conflict of interest is simply deemed irrelevant, as the present case amply demonstrates.

In truth, supervisory influence is ubiquitous within SNA. Quite apart from the formal structure in which supervisors vote on various matters, status as a senior member of SNA and supervisory authority within a health care facility often go together and it is well nigh inevitable that some of SNA's most active members will also be supervisors. SNA's board of directors, its ultimate governing authority to which the executive director and other staff employees must report, has supervisors as members. The nominating committee, which has great influence in determining who will become an officer or director, was chaired by a supervisor from North Shore Hospital at the time of the election. Little, if anything, has been done to insulate collective bargaining activities from the governance of the organization generally. The staff members who advise organized nurses and negotiate on their behalf serve at the pleasure of SNA's board. Even the EGW advisory council has supervisors as members, as did a task force on SNA's no-strike policy. District 14, which collects information on wages, hours, etc., of nurses, key information in developing bargaining demands, was chaired by a supervisor from North Shore Hospital. Supervisors have used a district meeting to voice opposition to the representation of rank and file nurses by a competing union. Finally, SNA seems quite prepared to refuse to cooperate with employers in seeing that Section 8(a)(2) is not systematically violated by the activities of supervisory nurses in SNA. To the contrary, it may be prepared to resist any attempts by employer hospitals to comply with the law, even by providing legal assistance to any supervisor whose continued employment is made contingent on resignation from SNA.

That was in fact the recommendation of an SNA committee which studied the conflict of interest problem.

Were the SNA an industrial union, we would be forced to conclude as a matter of law that it could not be permitted to represent rank and file employees. Viewing the totality of the circumstances, a real and imminent danger of a conflict of interest would be clearly present in the industrial context. The active role of supervisors in SNA's governance, the lack of insulation of the bargaining process from that governance and the lack of a mechanism to assist employers in preventing supervisors from violating Section 8(a)(2) through SNA activities would more than justify disqualification.

We decline to go that far, however. Although the Board has not distinguished between the legal rules applicable to professional organizations and those which govern industrial unions, seeking refuge instead in the comfortably narrow doctrine of *Sierra Vista,* it may be that some distinctions of that character will emerge upon remand. While we are skeptical that an organization such as SNA will emerge unmodified after the broader inquiry required by us, we do not want to discourage a full review of the problem on a clean slate by suggesting limitations on the results of that review.

We by no means suggest either that a professional organization such as SNA cannot have a collective bargaining component or that the Board may not take the multiple goals of such organizations into account in fashioning appropriate rules under Section 8(a)(2). That provision was passed at a time when the company union was a familiar tactic utilized to prevent organization by truly independent unions in the industrial context. SNA is hardly a company-dominated union. However, it is heavily influenced by supervisors of employees whom it represents in collective bargaining. The degree to which the Act requires a restructuring of a professional organization such as SNA is for the Board in the first instance to decide. It must, however, look at all the circumstances, including the structure of

276

the organization and the role of supervisors in its governance. Where that role is of significance, the Board should determine the appropriate methods of insulating the collective bargaining component and of preventing supervisors from violating Section 8(a)(2) through activities within the organization. Since the issue here arises in a number of contexts, it may well be an occasion for the use of the Board's rulemaking powers which will enable it to address the issues after receiving the views of the numerous professional organizations and employers affected.

The petition for enforcement is denied and the case is remanded.