**Slip Op. 99-106**

## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

_____

|  |  |  |
|---|---|---|
|  | **:** |  |
| NEC CORPORATION AND HNSX SUPERCOMPUTERS INC., | **:** |  |
|  | **:** |  |
| Plaintiffs, | **:** | Court No. 99-07-00443 |
|  | **:** |  |
| v. | **:** | **Before: Barzilay, Judge** |
|  | **:** |  |
| DEPARTMENT OF COMMERCE, | **:** |  |
|  | **:** |  |
| Defendant, | **:** |  |
|  | **:** |  |
| and | **:** |  |
|  | **:** |  |
| SILICON GRAPHICS, INC., | **:** |  |
|  | **:** |  |
| Defendant-Intervenor. | **:** |  |

_____

[Plaintiffs' Motion for Judgment Upon the Agency Record granted.]

Decided: October 8, 1999

Paul, Weiss, Rifkind, Wharton & Garrison (Robert E. Montgomery, Jr., Terence J. Fortune, Matthew Chavez, Heather Keele) for Plaintiffs.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice (Lucius B. Lau); Patrick V. Gallagher, Office of Chief Counsel for Import Administration, Department of Commerce, of counsel, for Defendant.

Wilmer, Cutler & Pickering (John D. Greenwald, Charles S. Levy, Sophie Moonen) for Defendant-Intervenors.

### OPINION

### I. INTRODUCTION

**BARZILAY, JUDGE:**

This case was brought by Plaintiffs NEC and HNSX pursuant to 28 U.S.C. § 1581(c)

(1994) and 19 U.S.C. § 1516a(a)(2)(B)(vi) (1994), to contest a determination of the Department of Commerce ("Commerce") that their proposed importation of a SX-5 Series System supercomputer ("SX-5") was within the scope of an antidumping duty order issued on October 24, 1997.  *See Notice of Antidumping Duty Order in the Antidumping Investigation of Vector Supercomputers From Japan*. 62 Fed. Reg. 55392 (Oct. 24, 1997) ("Order").

For the reasons set out in the opinion which follows, the Court holds that Commerce's scope determination is not supported by substantial evidence on the record and is not in accordance with applicable law.  The Court further holds that Plaintiffs' proposed importation falls outside the scope of the antidumping duty order.

## II. BACKGROUND

Plaintiff NEC, a Japanese corporation, sells vector supercomputer systems.  HNSX is a wholly-owned United States subsidiary of NEC which markets NEC's products in the United States and Canada.  In August 1996, in response to a petition by Cray Research, Inc.,[1] Commerce initiated an antidumping duty investigation to determine whether Japanese vector supercomputers were being sold at less than fair value in the United States. *See Initiation of Antidumping Duty Investigation: Vector Supercomputers From Japan*, 61 Fed. Reg. 43527 (Aug. 23, 1996) ("Initiation").   After the investigation and determination by the International Trade Commission ("ITC") that the import of vector supercomputers from Japan caused a threat of material injury, *see Notice of Final Determination of Sales at Less Than Fair Value: Vector Supercomputers From Japan*, 62 Fed. Reg. 45623 (Aug. 28, 1997) ("Final Determination"),

---

[1] Defendant-Intervenor, Silicon Graphics, Inc., is the parent of Cray Research. *Pub. A.R. Doc. 2* at 2.

Commerce issued the Order covering:

> all vector supercomputers, whether new or used, and whether in assembled or
> unassembled form, as well as vector supercomputer spare parts, repair parts,
> upgrades, and system software, shipped to fulfill the requirements of a contract
> entered into on or after October 16, 1997, for the sale and, if included,
> maintenance of a vector supercomputer.

62 Fed. Reg. at 55392. In 1996 Plaintiffs and Digicon Geophysical Corp., now Veritas, entered

into a contract ("contract") by which Veritas leased NEC manufactured supercomputer systems

and equipment from HNSX, and was to receive support services and software from HNSX during

a minimum lease period of 48 months. *Pub. A.R. Doc. 1, Attachment*. The contract provided that

Veritas would have access to upgraded supercomputing systems that became available during the

term of the lease. It stated specifically that Veritas had:

> the option to substitute for an installed SX-4 Series hardware unit component . . .
> new or improved NEC manufactured equipment having feature improvements
> and/or an announced lower price for equivalent performance or capacity.

*Id.* at 18. Following execution of the contract on June 12, 1996, NEC and HNSX installed the

SX-4 Series System ("SX-4") at the Veritas facility. In March 1999, Veritas instructed HNSX to

substitute the SX-5 for the SX-4. Veritas stated in its March 12, 1999 letter to HNSX that it was

exercising its option under the original contract and that because the existing contract was not

covered by the Order, "the SX-5 Series system can therefore be made available to use in the

United States." *Id.* at 1. In May 1999, Plaintiffs filed a Scope Determination Request seeking

confirmation that the projected importation of the SX-5 would be outside the scope of the Order.

*Pub. A.R. Doc. 2* at 1.

On July 9, 1999, Commerce issued its final scope determination finding that the SX-5 was

within the scope of the Order. *Pub. A.R. Doc. 5.* In response to NEC's position that Veritas

exercised an option in the 1996 contract when it ordered the importation of the SX-5, the

Department stated,

> In determining whether the importation of the SX-5 is included within the
> scope of the order, the decisive factor is the date of sale, i.e. whether the date
> of sale is before or after October 16, 1997 . . . . The contracts exemption in
> the scope of the order was intended to exempt only those entries of vector
> supercomputer systems or vector supercomputer parts, upgrades, and systems
> that were specifically provided for in contracts entered into prior to October
> 16, 1997. The contract between HNSX and Veritas included an option to
> upgrade the SX-4 at some point in the future. However, this contract did not
> establish the essential terms of sale for the SX-5. The terms of sale for the
> SX-5 were set by an exchange of letters on March 12, 1999. Therefore, for
> purposes of the antidumping duty order on vector supercomputers from
> Japan, the upgrade to the SX-5 constitutes the formation of a new contract
> entered into on March 12, 1999. Accordingly, the importation of the SX-5 is
> subject to the order.

*Id.* at 7-8. Accordingly, Plaintiffs brought this suit challenging as unlawful the scope

determination holding the importation of the SX-5 subject to the Order. Plaintiffs claim that

Commerce's date of sale analysis is contrary to law, and that the option contained in the 1996

contract is enforceable as part of the 1996 contract and thus outside the scope of the order.

Commerce defends its decision that the SX-5 is included within the scope of the Order, claiming

that, rather than changing its terms, it reasonably clarified the Order because: (1) in the Order

Commerce specifically reserved for the future the question whether merchandise purchased

pursuant to an option that existed in a contract entered into prior to October 16, 1997 but

exercised after that date would be subject to antidumping duties; (2) in establishing the meaning

of the word "contract" contained in the Order, Commerce properly resorted to its own body of

law; and (3) Commerce properly interpreted the word "contract" to mean the date upon which the

material terms of sale are set.

### III. STANDARD OF REVIEW

"In reviewing injury, antidumping, and countervailing duty investigations and determinations, the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record or otherwise not in accordance with law.'" *Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996), (quoting 19 U.S.C. § 1516a (b)(1)(B)). Substantial evidence "is more than a mere scintilla," *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); and "such relevant evidence as a reasonable mind might accept to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). When deciding whether Commerce's scope determination is correct the court employs the substantial evidence standard as follows: "In actions challenging a determination as to whether a particular type of merchandise is covered in an existing antidumping duty order, . . . this court must decide whether the challenged determination is supported by substantial evidence on the record and otherwise in accordance with the law." *Mitsubishi v. United States*, 16 CIT 730, 805 F. Supp. 455, 458 (1992) (citation omitted).

In reviewing the scope determination in this case, the Court's task is different from the one usually confronting a reviewing court. In the more typical scope determination review, such as in the *Mitsubishi* case cited above, the court reviews Commerce's application of a specific set of facts, usually the physical and technical specifications of the product at issue, with the terms of the antidumping duty order. That is not the task here. This dispute centers on Commerce's interpretation of the language "shipped to fulfill the requirements of a contract entered into on or after October 16, 1997. . . ." 62 Fed. Reg. at 55392. The operative determination is whether the

original contract required the shipment of the SX-5; therefore, this decision involves analysis of general contract law principles.

When a court reviews an issue within the special expertise of an agency, considerable deference is due. The Federal Circuit explained this principle as follows:

> Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts. This deference is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute, as opposed to interpreting the meaning of the statute itself where ambiguous.

*Fujitsu,* 88 F.3d at 1039 (citations omitted). The Court recognizes that Commerce has "broad authority to interpret its own antidumping duty orders. . . ." *INA Waltzlager Schaffler KG v. United States*, 108 F.3d 301, 307 (Fed. Cir. 1997). As a general rule, agencies are afforded deference in interpretation of their own orders, especially when the interpretation is of long standing and there are underlying policy reasons for the position. *See Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) ("This broad deference is all the more warranted when, as here, the regulation concerns. . . 'the exercise of judgment grounded in policy concerns.'" (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)).

However, "[i]t is clear that no deference is due to an agency 'interpretation' fashioned for the purposes of litigation." *Alaniz v. Office of Personnel Management*, 728 F. 2d 1460, 1465 (Fed. Cir. 1984) (citation omitted). Here, Commerce's "date of sale" explanation is litigation strategy rather than a regular agency practice. In its brief, Defendant attempts to show that Commerce's date-of-sale analysis was part of regular agency practice: "[T]he inquiry facing Commerce in the *Final Scope Determination* was, in substance, no different that [sic] the inquiry

facing the agency in its annual administrative reviews." *Def.'s  Mem. in Opp. to Pls.' Mot. for J.*

*Upon the Agency R.* at 36.  Commerce attempts unsuccessfully to analogize the case before this

Court to the circumstances in *Toho Titanium Co., Ltd. v. United States*, 14 CIT 500, 743 F.

Supp. 888, (1990).  In *Toho*, this court determined that in order to properly ascertain whether

sales of titanium sponge in the United States were at less than fair value, "Commerce must

determine the date when a sale has taken place."  Id. at 501, 743 F. Supp. at 890.  Commerce's

finding that the date of sale occurred when the customer issued its delivery instructions to Toho

was held "consistent with past administrative practice, . . . and is in accordance with law."  *Id.* at

503, F. Supp. at 891.

The Court does not dispute that Commerce may determine when the date of sale of a

product takes place.  Comparing sales for the purpose of determining whether there were sales

made at less than fair value is within the core expertise of Commerce.  However, Commerce does

not as a regular practice determine the date of a valid contract.[2]  Its equation of date of sale to

date of contract is not past agency practice, deserving of deference to agency expertise, but

merely a litigation tactic.  Therefore, under these unusual circumstances, the Court must review

Commerce's scope determination without according deference to the agency, and must look to

general contract law to determine the meaning of the word "contract."[3]

---

[2]   For this reason as well, Commerce's regulations concerning "other scope determinations," 19 C.F.R. § 351.225(k) (1999), do not govern this case.

[3]Commerce argued in its brief that its decision warranted Chevron deference but abandoned its position at oral argument, held September 22, 1999, in favor of a "different kind of deference."  *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984).  As explained, the Court here does not agree.

## IV. DISCUSSION

A.      *The language of the Order is unambiguous and should be given its traditionally accepted meaning.*

The Court must first consider the plain meaning of the Order in determining its scope. "To interpret a regulation we must look at its plain language and consider the terms in accordance with their common meaning." *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997) ) (citation omitted).[4]  If the language is clear and unambiguous, there is no need to further speculate as to what Commerce may have intended.  *See id* at 1227.  Additionally, language "is presumed to be used in its normal sense, in the absence of proof of a special meaning in the trade." *United States v. Esso Standard Oil Co.*, 42 C.C.P.A. 144, 151 (1955).

The government argues that "Commerce properly resorted to its own body of law, not state contract law or general contract principles," by interpreting the Order by way of its date of sale analysis. *Def.'s Mem. in Opp. to Pls.' Mot. for J. Upon Agency R.* at 25.  In support of this contention it cites a statement by this court that "[w]hile Commerce is not precluded from referring to state contract law or general contract principles, it is not required to do so." *Toho,* 14 CIT at 504.

The Court's decision in this case is not at odds with the principles articulated in *Toho Titanium*.  That case involved the determination of an antidumping duty rate: a responsibility delegated specifically to the Department of Commerce.  This court noted that an absolute requirement that Commerce make its determinations based on state contract law could potentially

---

[4]The Court notes the difference between a regulation and an order and that the procedural safeguards in the regulatory process do not necessarily apply in the promulgation of orders. Therefore, the *Lockheed* tenet applies with even more force to agency orders.

result in contracts that were "insufficiently definite under the trade laws" or "inconsistent with the uniform administration of the antidumping law." *Id.*

The case at bar does not involve a technical determination in an antidumping duty order. Rather, it concerns the interpretation of the word "contract," a task not delegated to the expertise of Commerce. Hence, Commerce's reliance on *Toho Titanium* is misplaced. Commerce has the authority to make an antidumping determination without limiting its consideration to state contract law. However, when the dispute falls outside the realm of Commerce's delegated duty, Commerce is required to interpret language in accordance with its plain meaning. "The 'plain meaning' rules of statutory construction apply to the interpretation of administrative regulations." *Whelan v. United States*, 529 F. 2d 1000, 1002-03 (Ct. Cl. 1976) (citations omitted).

As stated by the Federal Circuit in *NSK Ltd. v. United States*,, where a term with an "accumulated, settled meaning" has no special meaning in antidumping law, it should be accorded its ordinary meaning. 115 F.3d 965, 974 (Fed. Cir. 1997). "In determining the common meaning of a term, courts may and do consult dictionaries, scientific authorities, and other reliable sources of information including testimony of record." *Holford USA Ltd. v. United States*, 19 CIT 1486, —, 912 F. Supp. 555, 561 (1995). The commonly understood meaning of the term "contract" comes from traditional sources, not Commerce's "own body of law."

The traditional definition of the term "contract" is "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." SAMUEL WILLISTON, *A TREATISE ON THE LAW OF CONTRACTS* § 1:1 (Richard A. Lord, 4th ed. 1990) (citing RESTATEMENT SECOND OF CONTRACTS §1 (1979)). The Federal Circuit defines "sale" as the "transfer(s) of property from one party to another for a

consideration." *NSK*, 115 F.3d at 975. Black's Law Dictionary defines the phrase "contract of sale" as an "agreement under which the seller agrees to convey title to property upon payment by buyer under terms of contract." BLACK'S LAW DICTIONARY 326 (6th ed. 1990). These accumulated and settled meanings of "contract" and "sale" are clearly distinct from each other, yet Commerce equates the phrase "date of contract" with "date of sale" in its scope determination. *Pub. A.R. Doc. 5* at 7. As in *Ericsson GE Mobile Communications Inc. v. United States*, "Commerce presents an absurd argument: [Plaintiffs] may not rely on the language of an order, but must instead apply a standard which Commerce has failed to articulate." 18 CIT 252, —, 850, F. Supp. 34, 38 (1994), *aff'd in part, vacated in part on other grounds, and remanded*, 60 F.3d 778 (Fed. Cir.1995).

> B.      *The option to upgrade was part of the contract of June 12, 1996,*
> *and became binding when the contract was executed.*

The contract executed by Plaintiffs on June 12, 1996 covered many items. In its Addendum A, paragraph 5, the Contract provided Veritas with an irrevocable option to purchase more technically advanced vector computer systems in substitution for its SX-4 or to accept a lower lease rate. *Pub. A.R. Doc. 1, Attachment* at 18. This option was to become available when certain conditions, specifically set out in the contract, occurred.[5] Thus, the parties were obligated on June 12, 1996 to perform the terms of the option. They were not free to change their rights and obligations concerning this option after that date.

---

[5]"The conditions precedent [were] (1) the equipment must be 'new or improved NEC manufactured equipment having feature improvements and/or an announced lower price for equivalent performance or capacity:" (2) substitution may only be made for NEC products that have been installed at Veritas' facility for at least 24 months; and (3) the new equipment must be available in the United States," *Mem. in Support of Pls.' Rule 56.2 Mot. for J. on Expedited Review of Admin. Determ. Upon Agency R.* at 6, n.4., citing *Contract, Pub. A.R. Doc. 1.*

A sale made under such a contract constitutes the performance of the obligations of the original contract, rather than a new contract in and of itself. An option contract is "a promise which meets the requirements for the formation of a contract and limits the promisor's power to revoke an offer." RESTATEMENT (SECOND) OF CONTRACTS § 25 (1981). Here, that option was an integral part of the valid contract covering the entire range of obligations surrounding the purchase, maintenance, and upgrade of a vector supercomputer system.

Significantly, Commerce does not contest that a valid contract for the option upgrade on June 12, 1996 was entered into at that time. Defendant-Intervenor, Silicon Graphics, Inc., did dispute the existence of a valid contract for the optional upgrade at the time of the original contract.[6] However, as Commerce's language in the scope determination confirms, all the elements of a valid contract for the option itself were in place on June 12, 1996. *Pub. A.R. Doc. 5* at 7 ("The June 12, 1996, contract specified that Veritas had the option to replace the installed SX-4 with newer or improved NEC-manufactured equipment having feature improvements."). Therefore, under general contract principles, the contract containing the upgrade option was entered into on June 12, 1996, and the exercise of the option after October 16, 1997 did not constitute a separate contract.

> C.       *Importation of the SX-5 is a legitimate exercise of the option and therefore falls within the exemption language of the order.*

Commerce has attempted to fulfill its duty of "clearly establish(ing) what products are covered," *Ericsson,* 18 CIT 252, —, 850 F. Supp. at 38, by the language of the Order:

---

[6] At oral argument held on September 22, 1999. Silicon Graphics, Inc.'s response brief was stricken upon motion of Plaintiffs as it was filed late, contrary to the provisions of the Court's Order Establishing Expedited Briefing Schedule, dated July 28, 1999.

> The scope of this order consists of all vector supercomputers [and parts] . . . shipped to fulfill the requirements of a contract entered into on or after October 16, 1997, for the sale and, if included, maintenance of a vector supercomputer.

62 Fed. Reg. at 55392. The Court must determine whether the importation of the SX-5 was "shipped to fulfill the requirements of" the original contract entered into on June 12, 1996. If it was, the SX-5 importation is outside the scope of the antidumping duty order.

The Court agrees with Plaintiffs that the Order's language is "explicit and definite on the issue of its scope," *Mem. in Support of Pls.' Rule 56.2 Mot. for J. on Expedited Review of Admin. Determ. Upon Agency R*. at 14. As stated above, the "option to substitute for an installed SX-4 Series hardware unit component . . . new or improved NEC manufactured equipment having feature improvements and/or an announced lower price for equivalent performance or capacity," is a requirement of the June 12, 1996 contract. *Pub. A.R. Doc. 1*, *Attachment* at 18. There is no dispute that the SX-5 is indeed considered "new or improved NEC manufactured equipment." Under the plain meaning of the words of the Order, it is clear that importation of the SX-5 constitutes performance under a classic requirements contract entered into prior to October 16, 1997. The proposed substitution is therefore excluded from the Order, as an upgrade shipped to fulfill the requirements of a contract entered into before October 16, 1997.

> D.  *In substituting its "date of sale" analysis for the accumulated and settled meaning of the term "contract," Commerce unlawfully expanded the Order.*

The Court agrees with Plaintiffs that Commerce went beyond the scope of its authority by equating the phrases "date of contract" and "date of sale." Plaintiffs refer the Court to *Smith Corona Corp. v. United States*, in which the Federal Circuit detailed Commerce's permitted level of authority to construe the scope of an Order: "Although the scope of a final order may be clarified, it can not be changed in a way contrary to its terms." 915 F.2d 683, 686 (Fed. Cir. 1990).

The Order by its terms excludes requirements contracts entered into before October 16, 1997 from

its mandate. *See* 62 Fed. Reg. at 55392 ("[T]he scope of this order consists of all vector

supercomputers. . . shipped to fulfill the requirements of a contract entered into on or after

October 16, 1997.").

The substitution of a "date of sale" test for the "date of contract" test results in an

impermissible expansion of the order.  Under its "date of sale" test, Commerce interpreted the

word "contract" to mean the date on which the material terms of sale for the upgrade were set.

*Def.'s Mem. in Opp. to Pls.' Mot. for J. Upon Agency R.* at 28.  In its scope determination,

Commerce stated that the terms of sale for the SX-5 were set by the exchange of letters on March

12, 1999, because that was when the price and date of substitution were established, and

determined that the proposed importation was therefore subject to the Order as a contract entered

into on or after October 16, 1997. *Pub. A.R. Doc. 2* at 7.

However, the shipment of the SX-5 was required by the original contract, not by the letter

of March 12, 1999.  General contract law requires that all material terms be established in the

contract itself to bind the parties to the agreement.  Yet the terms of the option itself do not need

to be definite or specific .[7]  Commerce's assertion that the price and date of substitution for the

---

[7]Williston details the extent of definiteness required in legally binding contracts:

> Certainty with regard to promises does not have to be apparent from the promise
> itself, so long as the promise contains a reference to some document, transaction
> or other extrinsic facts from which its meaning may be made clear.  Thus, a
> promise to do something . . . is sufficiently definite as soon as the external event
> occurs. . . . In fact, the most common illustration of agreements containing a
> reference to future events for a definition of their meaning is found in agreements
> to furnish a buyer's requirements or to sell the output of a certain plant or
> business.  There is no doubt that such promises are sufficiently definite for
> enforcement.

SX-5 needed to be specified in order for the option to be a valid part of the original contract creates an impermissible fundamental change in the effect of the Order. "Commerce has created a new standard, and has thus unlawfully expanded the scope of the Order." *Ericsson*, 18 CIT at —, 850 F. Supp. at 38.

Though Commerce certainly had the opportunity to reference the "date of sale" in its original antidumping duty order as the decisive factor in determining whether an importation would be subject to the Order , it did not do so. Commerce argues that because in the initial Order, the Department indicated that it would reserve the question of option contracts for case by case determination, "the *Antidumping Duty Order* contains no *per se* rule concerning such options. Rather, Commerce contemplated that the exercise of these options may or may not result in merchandise that is subject to antidumping duties, depending on the contract at issue." *Def.'s Mem. in Opp. to Pls.' Mot. for J. Upon Agency R.* at 25. Commerce seems to argue that in failing to articulate a per se rule regarding option contracts, the Department put the Plaintiffs on notice that a different standard might be substituted for the plain meaning of the word "contract." The Court does not agree.

This reservation cannot permit Commerce to alter the plain meaning of a previously issued Order. It does not change the fundamental principle that "[p]arties must be able to rely on a final determination or order as written — they cannot be required to discern Commerce's intent in drafting a final determination or order." *Ericsson*, 18 CIT at —, 850 F. Supp. at 38. As Plaintiffs aptly articulated, "case-by-case determinations regarding option contracts must follow

---

SAMUEL WILLISTON, *A TREATISE ON THE LAW OF CONTRACTS* § 4:27 (Richard A. Lord, 4th ed. 1990).

the standard set forth in the Order, not a newly discovered and substantively different criterion." *Pls.' Reply to Def.'s Mem. In Opp. to Pls.' Mot. for J. Upon the Agency R.* at 9. Reserving the right to determine whether or not option contracts will be included in the scope of an antidumping order does not give Commerce carte blanche to expand the scope of the Order. "To hold otherwise would inject a degree of uncertainty into trade activities which Congress never envisioned." *Ericsson*, 18 CIT at —, 850 F. Supp. at 38.

## V. CONCLUSION

This case does not involve a review of how Commerce has applied a certain factual situation to the terms of its regulations and the statutes it is charged with implementing. The record consists solely of documents prepared by the parties during the antidumping investigation, the scope determination process, and the contract itself. The issues involved in this case are purely legal, "thereby making a remand . . . a mere formality. . . ." *NLRB v. Jones & Laughlin Steel Corp.*, 331 U.S. 416, 431 (1947). Accordingly, the Court finds it unnecessary to remand for further action by Commerce.

The Court therefore holds that Commerce unlawfully expanded the scope of the Order in its determination of July 9, 1999 and the importation of the SX-5 is excluded from the antidumping duty Order on vector supercomputers from Japan dated October 24, 1997. Judgment will be entered accordingly.


Dated: _____                                          _____
      New York, NY                                          Judith M. Barzilay
                                                    Judge

## ERRATUM

*NEC Corp. and HNSX Supercomputers, Inc. v. Dept. of Commerce and Silicon Graphics, Inc.*,
Court No. 99-07-00443, Slip Op. 99-106, dated October 8, 1999.

Footnote 6 on page 11 of the Opinion should be changed to read as follows:

Because Silicon Graphics, Inc.'s response brief was filed and served contrary to the provisions of the Court's July 28, 1999 Order Establishing an Expedited Briefing Schedule, it is stricken by separate nunc pro tunc order, upon motion of Plaintiffs.

December 22, 1999